CHAPMAN, Commissioner of Insurance and Banking, et al. · v. GUARANTY STATE BANK OF CLEBURNE et al. (No. 11769.)

Court of Civil Appeals of Texas. Fort Worth. April 30, 1927.

Rehearing Denied July 16, 1927.

1. Sales ⟨⟩124—Purchaser, to be entitled to rescind for fraud, must restore purchased property or be relegated to action for damages.

It is a general rule of equity that, as a condition for the exercise of the right of rescission by the purchaser of a contract of sale induced by vendor's fraud, it is incumbent on purchaser to restore to vendor the property purchased or be relegated to his action for damages for the fraud practiced.

2. Banks and banking ⟨⟩63½—Purchasers of insolvent bank's assets, failing for over year and three months after discovering facts to assert banking commissioner's fraud, held estopped from rescinding on such ground.

Purchasers of the assets of an insolvent state bank from banking commissioner, who failed to assert any right to rescind because of commissioner's alleged fraudulent representations for over a year and three months after discovering facts, but elected to retain worthless notes included among the assets transferred, and on the trial of their action to rescind transaction did not show what portions of such assets had been collected, held estopped to assert such fraud as ground for rescission.

3. Banks and banking ⟨⟩63½—Banking commissioner's statements respecting insolvent bank's assets, inducing purchase, held unauthorized warranties, and purchasers were chargeable with notice thereof.

Alleged statements of banking commissioner that assets of insolvent bank remaining aft-

---

er taking out certain worthless· notes would leave solvent assets, which statements induced plaintiffs to purchase such assets, *held*, in legal effect, warranties which commissioner had no authority to make under orders of the district judge approving and confirming the sale, and plaintiffs were chargeable with notice of such lack of authority.

**4. Fraud ⬥31—Purchaser's· right to rescind for seller's misrepresentations is alternative to right to damages.**

Purchaser's right to rescind for seller's misrepresentations is an alternative to the right, if any, to recover damages.

**5. Trial ⬥350(3)—Failure to submit issues whether banking commissioner's statements respecting solvency of makers of notes included in insolvent bank's assets were mere . opinions or representations of fact held error.**

In action to rescind purchase of assets of insolvent bank from banking commissioner, failure to submit to jury defendants' requested issues as to whether statements made by commissioner to purchasers respecting solvency of makers of notes included in the assets transferred were expressions of opinions rather than representations of fact, and· so understood by the parties, *held* error, where evidence tended strongly to support defense that representations were mere expressions of opinion.

**6. Banks and banking ⬥63½—Refusal of instruction defining ratification by officers of new bank of purchase of assets of insolvent bank held error; ratification being mixed question of law and fact.**

In action to rescind purchase of assets of insolvent bank from banking commissioner on ground of commissioner's fraudulent representations which induced purchase, refusal of defendants' requested instruction as to what would constitute a ratification of the contract of sale by officers and representatives of·the new bank to which assets were transferred after·they had acquired full knowledge of the facts involved *held* error; question of ratification being a mixed question of law and fact.

On Motion for Rehearing.

**7. Banks and banking ⬥63½—That court confirmed banking commissioner's sale of insolvent bank's assets without hearing evidence held not to establish fraud on court.**

That court made orders approving and confirming sale of assets of insolvent bank by banking commissioner without hearing any further evidence as to whether sale should be made *held* not alone to establish commissioner's fraud on court in procuring such orders, even though in consummating sale in obedience to the orders commissioner misrepresented value of the assets and thereby induced plaintiffs to purchase assets.

Appeal from District Court, Johnson County; Irwin T. Ward, Judge.

Action by the Guaranty State Bank of Cleburne and others against J. L. Chapman, Commissioner of Insurance and Banking, and others. Judgment for plaintiffs, and defendants appeal. Reversed and rendered.

Chas. L. Black and Jno. W. Goodwin, both of Austin, and Heber Henry, of Cleburne, for appellants.

Keith & Prestridge, of Cleburne, and Bailey & Bailey, and R. L. Stennis, all of Dallas, for appellees.

DUNKLIN, J. This is the second appeal in the above-entitled cause; the final disposition of the first appeal appearing in the opinion of the Commission of Appeals and reported in 267 S. W. 690. The history of the transaction in which the controversy originated is recited in that opinion, and therefore a repetition of all the details will not be necessary in this opinion.

As shown in that opinion, this suit was instituted by the Guaranty State Bank of Cleburne and its directors against J. L. Chapman, commissioner of insurance and banking of the state, and members of the state banking board, to obtain a rescission and cancellation of a contract in writing executed by Ed. Hall, the former commissioner of insurance and banking and predecessor of J. L. Chapman, and the Guaranty State Bank of Cleburne, dated April 15, 1922, and to recover of defendants the sum of $125,000 paid into the Guaranty State Bank by the stockholders of that bank.

The contract referred to above recites that the Traders' State Bank of Cleburne had become insolvent and the commissioner had taken over its assets and had added thereto the sum of $200,000 out of the state depositors' guaranty fund; .that, in addition to the sum so added, the assets of the Traders' State Bank included bills receivable equal to the capital, surplus, and undivided profits of that bank, amounting to $328,160.12, from which was deducted the sum of $15,000, leaving a total balance of $313,160.12, all of which together with an assessment that had been levied by the commissioner against the stockholders of the Traders' State Bank on their capital stock and another item of $15,000 was reserved by the commissioner from the assets of the Traders' State Bank, and the $200,000 was turned over to the Guaranty State Bank in trust to be applied to the satisfaction of the unsecured, noninterest-bearing claims of the depositors of the Traders' State Bank. The balance of the assets of the Traders' State Bank, not so reserved by the commissioner, less notes aggregating $313,000 which were eliminated because they were worthless, were transferred and assigned by the commissioner to the Guaranty State· Bank, who, in consideration therefor, contracted and agreed to apply the $200,000 so furnished by the commissioner out of the depositors' guaranty fund to the satisfaction of the claims of the depositors of the Traders'

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

State Bank, whose accounts were unsecured and bore no interest, and bound itself "absolutely and at all events to assume, pay off, liquidate, discharge, and satisfy all lawful debts, lawful liabilities, and lawful claims, known and unknown, of all creditors of the Traders' State Bank of Cleburne, Tex., excepting, however, any liability of said Traders' State Bank to its stockholders."

The contract contained these further stipulations:

"And, in case any litigation shall arise against the commissioner on account of this contract, the bank agrees, as its own proper cost of any and every nature whatsoever, including attorneys' fees, to defend the same and to pay any judgment that may be rendered against the commissioner in any such litigation.

"And the said bank specially guarantees unto the commissioner that it will properly and faithfully apply the sum of $200,000 unto the payment and satisfaction of the depositors of the Traders' State Bank whose accounts are unsecured and bear no interest, and that said sum of $200,000 so advanced by him from the depositors' guaranty fund shall be sufficient therefor and that no further advances of such nature shall be required to protect such liability of the Traders' State Bank."

The contract further recites that the Guaranty State Bank had been organized with a paid-up capital stock of $100,000, and that it was then in a position to administer the assets and liabilities of the Traders' State Bank, under the terms of said transfer, safely to all creditors, and with far less loss and impairment of the assets than would be occasioned under the enforced continued liquidation thereof by the commissioner.

The record shows that the Guaranty State Bank was chartered on April 13, 1922, for the purpose of taking over the assets of the Traders' State Bank and pursuing a banking business in the town of Cleburne. The following is a list of the subscribers to the charter, the amount of capital stock subscribed by each, and the place of residence of each, all of whom were by the charter made directors of the Guaranty State Bank for the first year of its existence:

| Name. | Place of Residence. | No. of Shares Subscribed and Paid for. |
| --- | --- | --- |
| J. G. Dunlap | Cleburne, Tex. | 25 |
| H. L. Wallace | Cleburne, Tex. | 25 |
| Bayard Taylor | Cleburne, Tex. | 250 |
| S. W. Sibley | Dallas, Tex. | 340 |
| Reese S. Allen | Wichita Falls | 340 |
| W. F. Wallace | Dallas, Tex. | 10 |
| Gus Ayres | Dallas, Tex. | 10 |

At the first meeting of the board of directors Gus Ayres tendered his resignation and was succeeded by R. B. Caldwell, who was elected president.

The proof further showed that, after the contract of purchase and sale between Ed Hall, commissioner, and the representatives of the Guaranty State Bank had been reduced to writing and agreed on tentatively by the parties, subject to the approval of the judge of the district court of Johnson county, Ed Hall filed with said judge his petition for authority to enter into said contract. The petition was signed by W. A. Keeling, Attorney General, and Eugene A. Wilson, Assistant Attorney General, as attorneys for the commissioner, and the petition was duly verified by the commissioner. Attached to the petition was a copy of the contract already tentatively agreed upon by the parties. On the same day of its filing, the judge indorsed his fiat thereon, setting the hearing thereof and directing notice be given to the Traders' State Bank, in the absence of a waiver of such notice by that bank. On the same day the Traders' State Bank, through its president, filed its waiver of service of such notice and entered its appearance for said hearing. On the same day the said district judge heard and granted the petition. The order of the judge made upon such hearing contained these recitals:

"The said petition was considered by the judge of the court; and having heard the evidence and being fully advised as to the facts, the judge is of the opinion that the petition should be in all things granted; and that the sale and transfer of the assets contemplated, and set forth therein, should be consummated.

"It is therefore considered by the judge, and so ordered, that the said Ed Hall, as commissioner of insurance and banking of the state of Texas, be and he is directed to conclude the contract described in said petition with the Guaranty State Bank and to sell to said Guaranty State Bank of Cleburne all of the assets of the Traders' State Bank, in said petition described, and that all of the terms of the said contract, as alleged, be carried out in all respects; the said Guaranty State Bank assuming the liabilities and obligations in said contract specified.

"It is further ordered that upon the report of the final conclusion of such sale by said Hall unto the said Guaranty State Bank and upon the approval of the judge of this court of such conclusion of such contract, the same shall become effective."

The contract was executed in obedience to the authority and direction so given by the district judge, and the transfers so authorized were duly made by the commissioner, subject to confirmation by the court. By another order the judge approved and confirmed the sale upon a report thereof duly filed.

The Guaranty State Bank then took charge of the assets and began the transaction of a banking business in the town of Cleburne.

The Traders' State Bank became insolvent, and its doors were closed by action of its board of directors on April 15, 1922. At that time, and for more than one year prior thereto, the following persons constituted its board of directors: S. P. Ramsey, O. L. Bishop. F. H. Barlow, J. G. Dunlap, and H. L. Wallace.

During the month of September, 1921, and thereafter, the defendant J. L. Chapman, commissioner of insurance and banking, who had succeeded Ed Hall, after an investigation of the affairs of the Guaranty State Bank, demanded of its officers that its stockholders put into the bank the sum of $25,000 to replace bills receivable found to be worthless, which, according to allegations and testimony of plaintiffs, formerly belonged to the Traders' State Bank; and that demand was complied with over protest by the officers of the bank. The Guaranty State Bank then continued to do business until April 4, 1923, when the commissioner of insurance and banking, over the protest of the officers of the bank, took charge of its business on grounds of its insolvency. Neither then nor at any time prior thereto did the officers of the Guaranty State Bank complain that they had been defrauded by Ed Hall, nor did they then offer to rescind the transaction with Ed Hall, nor had they at any time prior thereto offered such rescission.

This suit was based upon allegations to the effect that S. W. Sibley, Reece S. Allen, J. G. Dunlap, H. L. Wallace, and other incorporators of the Guaranty State Bank had been induced to enter into the contract of purchase and sale by the fraudulent misrepresentations of Ed Hall, commissioner, and W. A. Sandlin, his assistant, acting under his direction, to the effect that—

"By taking from the assets of said Traders' State Bank the amount of undesirable notes which the said Ed Hall, commissioner, was proposing to take therefrom, the remaining notes held by said Traders' State Bank would be good and solvent notes, and the removal of such amount of undesirable notes would clean said Traders' State Bank, and the transfer to the proposed new bank of the remainder of the assets of said Traders' State Bank, including all of its notes not removed by said Ed Hall, commissioner, would give to the proposed new bank clean assets and make it one of the cleanest banks in Texas, and that the removal of such amount of undesirable notes from said Traders' State Bank would take from the assets of said Traders' State Bank all worthless and doubtful paper."

As shown in the opinion disposing of the former appeal, the relief prayed for in the suit as originally instituted was for a rescission of the contract referred to above, with restoration to the commissioner of all the remaining assets on hand of the Traders' State Bank and for the recovery of $125,000 paid in to the Guaranty State Bank by its stockholders.

As disclosed in that opinion, it was held that the sale to the Guaranty State Bank by the commissioner was a judicial sale, which could not in any event be rescinded in the absence of direct proceedings to vacate the orders of the court under and by virtue of which the sale was made, and that, since plaintiffs had not in their pleadings made a direct attack upon those orders, they were in no position to recover for that reason alone, independently of any other.

After a remand of the cause, plaintiffs filed amended pleadings in which Chas. O. Austin, as successor to the former commissioner J. L. Chapman, and the members then composing the state banking board of Texas, were all made defendants. In their pleadings, plaintiffs made substantially the same allegations with respect to the alleged fraud on the part of Ed Hall in inducing the execution of the contract between him and the Guaranty State Bank, in connection with further allegations to the effect that the orders of the district judge, approving the contract in question, authorizing the commissioner to execute it and to make the necessary transfers in consummation thereof and later confirming the same, were all procured by fraud practiced upon the judge by the commissioner Ed Hall for the purpose of perpetrating a fraud upon the Guaranty State Bank and its organizers and incorporators, in that the applications made to said judge and the orders made by the judge thereon were all prepared by Commissioner Hall or by his attorney; that said orders were signed by the judge without reading them, upon the request of the commissioner, and upon his statement that the major portion of the assets of the Traders' State Bank had been sold to the Guaranty State Bank and upon his request for the approval of the sale; that the recitals in said orders, to the effect that the court considered the report and made inquiry into the facts and was of the opinion that the report should be in all things approved, were in fact untrue. It was further alleged, in effect, that the officers of the Guaranty State Bank were not present at those hearings, took no part in those proceedings, was not a party thereto, and knew nothing of the alleged fraud so practiced by the commissioner upon the court. There were further allegations to the effect that plaintiffs did not discover the falsity of the representations made by the commissioner which induced plaintiffs to enter into the contract in question until after the commissioner had declared the Guaranty State Bank insolvent and had taken over its assets, which action on the part of the commissioner plaintiffs alleged was wrongful and without just cause.

There were further allegations by plaintiffs to the effect that the business of the Guaranty State Bank was conducted by its officers honestly, faithfully, and carefully, without loss and at a profit, that the closing of the doors of the bank by the commissioner was due to no fault or failure on the part of the officers of the bank, and that but for the worthless notes and paper transferred to it by the commissioner the Guaranty State Bank was solvent at the time its doors were closed. Apparently this allegation was made

for the purpose of meeting the objection that plaintiffs did not return, or offer to return, and manifestly was unable to return, to the commissioner all the assets of the Traders' State Bank which the commissioner had turned over to the Guaranty State Bank.

The case was tried before a jury, and the special issues, with the findings thereon by the jury, are as follows:

"(1) In his effort to sell or reorganize the Traders' State Bank, did Ed Hall, commissioner of insurance and banking, in words or in substance, propose to sell to S. W. Sibley a clean bank? Ans. Yes.

"(2) If you have answered 'Yes' to special issue No. 1, then did S. W. Sibley and his associates accept the proposition of Ed Hall, if any, referred to in special issue No. 1? Ans. Yes.

"(3) Did Ed Hall, commissioner of insurance and banking, represent to Reece S. Allen, J. G. Dunlap, S. W. Sibley or H. L. Wallace as a fact that he would sell them or any of them and their associates a clean bank or that in selling the Traders' State Bank or its assets he would clean said bank or its assets or take from said bank whatever paper it was necessary to take in order to clean said bank or its assets? Ans. Yes.

"(4) Was it the understanding and intention of Ed Hall, commissioner of insurance and banking, and those to whom he sold the greater part of the assets of the Traders' State Bank, that said Ed Hall would reserve and take from such assets all worthless notes? Ans. Yes.

"(5) Was a large amount of the notes sold by said Ed Hall to said Guaranty State Bank worthless on April 15, 1922? Ans. Yes.

"(6) Did Ed Hall, commissioner of insurance and banking, on or prior to April 15, 1922, at or prior to the execution of the written memorandum of agreement of that date, represent, in words or substance, to S. W. Sibley or Reece S. Allen, as a fact and as an inducement to either of them to organize a new bank at Cleburne and purchase part of the assets of the said Traders' State Bank of Cleburne, that taking from the assets of the said Traders' State Bank the amount of notes and other assets reserved by the commissioner in said written memorandum of agreement and depositing in said bank $200,000 from the guaranty fund, would clean said Traders' State Bank? Ans. Yes.

"(7) If in answer to any of the foregoing issues or questions you have found that Ed Hall, commissioner of insurance and banking, did make any of the representations therein mentioned, did the Guaranty State Bank and its organizers believe and rely upon such representations, if any, in agreeing to purchase said assets and in closing their deal with said Ed Hall, commissioner, on April 15, 1922? Ans. Yes.

"(8) If in answer to any of the foregoing issues or questions you have found that Ed Hall, commissioner of insurance and banking, did make any of the representations therein mentioned, then were such representations untrue? Ans. Yes.

"(9) Did the losses, then known or unknown, of the Guaranty State Bank, by reason of worthless notes sold by Ed Hall to said Guaranty State Bank when it was organized on April 15, 1922, then exceed the sum of $100,000? Ans. Yes.

"(10) After acquiring full knowledge of the material facts involved in the transaction whereby Ed Hall, commissioner of insurance and banking, had sold and transferred to the Guaranty State Bank on April 15, 1922, certain notes and assets of the Traders' State Bank, did the Guaranty State Bank, through its officers and representatives, ratify the contract under which said Ed Hall, commissioner, sold and transferred said notes and assets to said Guaranty State Bank? Ans. No."

Upon that verdict the court rendered a judgment in favor of the plaintiffs, setting aside the orders of the court theretofore made, referred to above, authorizing the commissioner to execute to the plaintiffs the contract of sale and approving the same and directing the execution of the conveyance of the assets in accordance with the terms of the contract; also rescinding and canceling the contract between the parties; also awarding to the plaintiffs a recovery against the defendants in their respective official capacities for the sum of $125,000, with interest thereon at the rate of 6 per cent. per annum from April 21, 1923, with an order to the defendants to satisfy said judgment out of the depositors' guaranty fund; also establishing said judgment as a valid claim against the depositors' guaranty fund and the liquidating funds of the Traders' State Bank and the Guaranty State Bank now held by the commissioner, subject only to the claims for any valid, unpaid, unsecured, and noninterest-bearing depositors. The relief so granted was prayed for in the amended petition upon which plaintiffs went to trial.

At the outset it will be noted that there was no finding by the jury upon the issues tendered by the plaintiffs that Ed Hall, or any one else representing him, made any misrepresentations of fact to the district judge, which induced the granting of the orders authorizing and directing the commissioner to sell the assets of the Traders' State Bank to the Guaranty State Bank in accordance with the terms of the contract and thereafter approving and confirming the sale so made; nor was there any evidence to sustain plaintiffs' allegations of such facts. Furthermore, there was neither allegation nor proof that the directors of the Guaranty State Bank who negotiated the trade with the commissioner Hall were prevented from appearing in court when the orders were made and there controverting the showing made by the commissioner as the basis for the granting of the orders.

Plaintiffs having failed to sustain their allegations of fraud practiced upon the district judge, which induced him to make the orders referred to above, it follows that the fraud alleged by them, practiced by Ed Hall, the commissioner, and found by the jury,

which induced them to enter into the contract of purchase and sale, was the sole basis for the relief granted by the trial court in the judgment from which this appeal was prosecuted.

In 2 Black on Rescission and Cancellation, § 443, the following is said:

"The transfer of property by means of judicial sale constitutes a contract, the court which orders the sale being the vendor and contracting party on the one side and the purchaser at the sale the other, while the officer who conducts the sale is the agent or representative of the court."

To the same effect, see 16 Ruling Case Law, § 2, p. 6, and section 54, p. 75; also 35 Corpus Juris, § 2, p. 8.

The following is quoted from 2 Black on Rescission and Cancellation, § 594:

"If a person, after acquiring knowledge of circumstances which would justify him in rescinding a contract to which he is a party, makes any declaration or does any act which distinctly recognizes the contract as still subsisting and as binding upon him, he will be held to have waived his right to rescind."

Also the following from section 596, by the same author:

"One who receives property under a contract, and discovers that he has been defrauded, should thereafter treat the property as a reasonably prudent and careful man is bound to treat the property of another found in his possession, but not as his own property. And if, instead of taking this course, he asserts ownership of the property, treats it as his own, and exercises acts of ownership over it, he will be held to have waived his right to rescind on account of the fraud."

To the same effect are sections 590, 595, 597, 598, and 599; also Minter v. Hawkins, 54 Tex. Civ. App. 228, 117 S. W. 172; Ellis v. Ellis, 5 Tex. Civ. App. 46, 23 S. W. 996.

[1] It is also a familiar general rule of equity that, as a condition for the exercise of the right of rescission by the purchaser of a contract of sale, induced by the fraud of the vendor, it is incumbent upon him to restore to his vendor the property purchased; otherwise he is relegated to his action for damages for the fraud practiced.

As noted above, the sale by Ed Hall to the Guaranty State Bank of the assets of the Traders' State Bank was consummated on April 15, 1922, and during the fall of that year J. L. Chapman, commissioner of insurance and banking, who had succeeded Ed Hall, after an investigation of the affairs of the Guaranty State Bank, called the attention of its officers to the fact that many of the bills receivable held by the bank, which had formerly belonged to the Traders' State Bank and which had been purchased by the Guaranty State Bank, were worthless, and demanded that the stockholders of the Guaranty State Bank pay into its capital the sum of $25,000 in order to replace such worthless notes, which demand was complied with.

[2] Indeed, those facts were specifically pleaded by the plaintiffs in their amended petition, upon which the last trial was had, save and except that transaction was alleged to have taken place "on or about the —— day of December, 1922." While it was further alleged and plaintiffs introduced testimony tending to prove that such addition of $25,000 to the assets of the bank by the stockholders was made "upon the personal assurance of J. L. Chapman, commissioner, that there was no other bad paper in said assets, and that there would be no further payment demanded from said stockholders to take the place of any of said paper that might be found to be worthless, and in order to have no friction with J. L. Chapman, commissioner, and to avoid any possible complications that might result from refusing," yet such representations by Chapman were made long after the sale had been consummated, and the same were not alleged by plaintiffs as a basis of their asserted right of rescission for the alleged fraud of Ed Hall in the first instance, which induced them to purchase the assets of the Traders' State Bank. Hence plaintiffs' right of rescission could not in any event have been based upon those representations and promises by Chapman, which were never brought to the attention of the court in making the same and in no manner induced it. It is to be noted further that, after plaintiffs, during the fall of 1922, discovered that Ed Hall had defrauded them in the sale made in April of that year, they failed then to make any complaint of any such fraud, and also failed to demand a rescission either of the commissioner or of the court who ordered the sale. To the contrary, they elected to retain the worthless notes of the Traders' State Bank as assets of the Guaranty State Bank; and neither in their pleadings nor in the evidence introduced upon the trial was there any showing as to what portions of the assets of the Traders' State Bank had been collected by the plaintiffs and what portions remained on hand at the time the doors of the Guaranty State Bank were closed by the commissioner on April 4, 1923.

Under the facts recited above and the authorities noted, we conclude that the defendants' plea of waiver and estoppel of the alleged fraud of Ed Hall, which induced plaintiffs to enter into the contract in controversy, was conclusively established, and that defense was of itself a complete bar to a recovery.

In the final disposition of the former appeal, the following was said:

"Having reached the conclusion that this action was not properly brought, it is not necessary to discuss certain questions, which would be pertinent if the suit had been brought in the nature of a direct proceeding to set aside and vacate the action of the district judge.

Some of these questions raise in our mind a very serious doubt of the right of defendants in error to recover at all in the light of the record as it now stands. This is particularly true, in view of the evidence that the organizers of the Guaranty State Bank were in equally as good position as the commissioner, if not better, to know and to learn the true value of the notes and paper assigned to them, and there is no sufficient allegation of fact as to why the purchasers had a right to rely upon the commissioner, or were fraudulently induced to forbear making examination and inquiry for themselves."

In adopting the opinion of the Commission of Appeals, the Supreme Court said:

"We approve the holding of the Commission of Appeals on the questions discussed in its opinion."

The language quoted, to the effect that the organizers of the Guaranty State Bank were in equally as good position as the commissioner, if not better, to know and to learn the true value of the notes and paper assigned to them, we construe as a conclusion of law, and the same conclusion is warranted under the evidence introduced upon the last trial.

In appellees' brief it is stated that the proof made at the last trial was substantially the same as that made at the first trial, from which the former appeal was prosecuted, except that the examiners' report and the testimony of the witness Gus Ayres, introduced on the first trial, was not introduced on the last trial, and at the last trial was introduced the following evidence not introduced on the first trial, to wit: The memorandum of agreement between Ed Hall and the directors of the Guaranty State Bank, set out above; the petition made by the commissioner to the district judge for authority to sell the assets of the Traders' State Bank to the Guaranty State Bank; the testimony of witnesses Thomas Johnson, Ed Taylor, Lynn P. Talley; the agreement between the parties as to the administration of the assets between the Traders' State Bank and the Guaranty State Bank that no receiver or liquidating agent had ever been appointed; proof that said banking commissioner had been called upon to prosecute this suit, as suggested in the opinion of the Commission of Appeals and certain minutes and letters. The testimony of the four witnesses just named was introduced by the defendants and tended to refute, rather than sustain, the allegation in plaintiffs' petition that they were induced to purchase the assets of the Traders' State Bank by fraudulent misrepresentations on the part of commissioner Ed Hall and his assistant Sandlin.

The other additional evidence referred to had no particular bearing upon that issue as a separate and distinct issue of fact. We shall not undertake to set out all the testimony supporting the conclusion of the Commission of Appeals noted, for to so do would unduly lengthen this opinion. But we will refer to some of its salient features. Ed Hall, the commissioner, was a resident of Austin, and the evidence does not show that he was personally acquainted with the makers of the bills receivable in favor of the Traders' State Bank at the time the sale was made, although it does show that he had previously investigated the condition of the Traders' State Bank and had closed its doors on account of its insolvency. But there is no showing of the sources of his information with respect to the financial responsibilities of the persons who were then indebted to the Traders' State Bank. The testimony further shows that S. W. Sibley, one of the plaintiffs who lived in Dallas, was an experienced banker and had been connected with several banks as an officer or director. Plaintiffs J. G. Dunlap and H. L. Wallace, two of the incorporators of the Guaranty State Bank, had theretofore been directors of the Traders' State Bank for more than a year. F. H. Barlow, who was an incorporator and became cashier of the Guaranty State Bank, and O. L. Bishop, its vice president, had likewise been officers and directors of the Traders' State Bank during the same length of time. And, in accordance with our interpretation of the conclusion noted in the opinion of the Commission of Appeals, it would follow from the facts recited, aside from other evidence, that plaintiffs failed to show any right of recovery.

[3, 4] The statements which the jury found were made by Ed Hall to induce, and which did induce, plaintiffs to enter into the contract of purchase, as alleged by them, were, in legal effect, warranties, which the commissioner had no authority to make, under the orders of the district judge; and plaintiffs were chargeable with notice of such lack of authority, since their purchase was under and by virtue of those orders, and there was no showing of excuse for their alleged lack of knowledge of the orders prior to the final consummation of the sale. Under such circumstances, we are inclined to the belief that the rule of caveat emptor is applicable, and that it would preclude a recovery by plaintiffs in any event, although we do not definitely so hold, in view of our foregoing conclusions, which render a decision of that question unnecessary to support our disposition of this appeal. 2 Williston on Contracts, §§ 643, 970, 971; Id. vol. 3, §§ 1504, 1505, 1508; 2 Black on Rescission and Cancellation, § 445. The right of rescission for such misrepresentations is an alternative to the right, if any, to recover damages, 3 Williston on Contracts, §§ 1454 and 1455.

[5] Independently of the foregoing conclusions, we are of the opinion further that the court erred at all events in not submitting to the jury the defendants' requested issues as to whether or not the statements made by Ed Hall to the directors and incorporators

of the Guaranty State Bank, with respect to the solvency of the makers of the notes held by the Traders' State Bank and transferred by the commissioner to the Guaranty State Bank, were expressions of opinions rather than representations of fact, and so understood by the parties. Those facts and the testimony of the witnesses introduced by the defendants, as well as the testimony introduced by plaintiffs themselves, strongly tended to support that defense. The defendants therefore had the right to an affirmative presentation to the jury of the facts so pleaded. Railway Co. v. McGlamory, 89 Tex. 639, 35 S. W. 1058; Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517; Id. (Tex. Civ. App.) 196 S. W. 648; Gammage v. Gamer Co. (Tex. Com. App.) 213 S. W. 930; Campbell v. Johnson (Tex. Com. App.) 290 S. W. 526; and many other authorities that might be cited. In 27 Corpus Juris, p. 74, the following is said:

"When the form of a statement, and the subject-matter or the circumstances under which it was made are such that it cannot fairly be construed as anything but an expression of opinion or belief, it is proper for the court so to hold, and to refuse to submit the question to the jury. But if, as is often the case, a statement is of such a nature that it may be interpreted either as a mere expression of opinion, or as a statement of facts, and there is any question as to how it was intended and understood, whether it amounts to fraud or not is a question of fact, and is for the jury. So ordinarily it is for the jury to say whether representations as to value, solvency, or a third person's financial ability are statements of fact or of opinion. The court may decide as a matter of law whether statements are of fact or of opinion, where they are in writing and in language, the meaning of which cannot be misunderstood. The question of whether defendant intended to be understood as expressing an opinion or as stating an existing fact is for the jury upon conflicting evidence as to the exact language used. Whether the parties are so situated that the representation of one as to his opinion may form one of the necessary elements of fraud or deceit is a question for the jury to determine."

In Benton v. Kuykendall (Tex. Civ. App.) 160 S. W. 438, cited by appellees in support of their contention that there was no error in the refusal of the requested instruction noted above, it is held that the trial court did not err in refusing a similar instruction with respect to alleged fraudulent misrepresentations as to the value of the property sold. But in that case the court, in discussing the requested charge, said:

"These charges were not, in our opinion, called for by the evidence, and would have been misleading if given. The evidence was wholly insufficient to warrant a finding that the representations made by appellant were the mere expressions of his opinion."

That case therefore is clearly distinguishable from the present suit.

[6] We sustain the further assignment of error to the action of the court in refusing appellants' requested instruction as to what would constitute a ratification of the contract of sale by the officers and representatives of the Guaranty State Bank after they had acquired full knowledge of the facts involved in the transaction, within the meaning of issue No. 10 that was submitted to the jury. The question of ratification was a mixed question of law and fact, and the jury should not have been left to determine that issue without some instruction from the court as to what acts would constitute a valid and binding ratification.

There are other assignments in the record which we deem unnecessary to determine, and therefore they will not be discussed.

Upon the conclusion we have reached that plaintiffs failed to sustain their allegations that the judicial orders were procured by fraud practiced upon the judge, and that the evidence conclusively shows that plaintiffs waived their right to complain of the fraud found by the jury, upon which they relied for the relief prayed for, and thereby ratified the contract of sale as made; and the further conclusion that the evidence shows without controversy that prior to and at the time of the consummation of the sale plaintiffs were in as good position, if not better, as was Ed Hall, the commissioner, to know the value of the assets of the Traders' State Bank taken over by the Guaranty State Bank, as held by the Commission of Appeals with the approval of the Supreme Court, the judgment of the trial court is reversed, and judgment is here rendered in favor of appellants, independently of the merits of the two assignments last discussed and sustained, and either of which would, at all events, require a reversal of the judgment and a remand of the cause.

BUCK, J., not sitting.

### On Motion for Rehearing.

DUNKLIN, J. A voluminous motion for rehearing has been filed by appellees in this cause, which has been duly considered. In that motion the following is said:

"The most vital error, as appellees understand this record, is in the conclusion reached by this honorable court that appellees failed to sustain their allegations that the judicial orders were procured by fraud practiced upon the judge, which induced him to make the orders pertaining to the sale of the property in controversy, and that it necessarily follows that the fraud alleged by appellees, as practiced by the banking commissioner upon them and found by the jury as having induced them to purchase the property, was the sole basis of the relief granted by the trial court, and was insufficient to support the judgment of rescission of said sale and the setting aside of said orders."

[7] In the motion it is insisted that the following facts, which it is claimed the evidence established, were sufficient to show that the orders of the court, under which the sale of the assets of the Traders' State Bank to the appellees was consummated, were procured by fraud practiced upon the court by Ed Hall, the banking commissioner, to wit:

(1) That the court did not set down the petition for hearing as recited in the first order.

(2) That the court did not hear evidence and was not advised as to the facts as recited in the second order.

(3) That the recitals in the report of sale made to the court by the commissioner, to the effect that he had concluded with the Guaranty State Bank of Cleburne the contract of sale, in pursuance of the court's order, and that the commissioner believed that the sale was fair and just, were all untrue.

(4) That the recital in the third order of the court, approving and confirming the sale, to the effect that the court had considered the report and made inquiry into the facts and had examined the statement of the assets and liabilities of the bank and was of the opinion that the report of sale should be in all things approved, was also untrue.

(5) That in making the third order of court the district judge relied solely upon the statements of Ed Hall and his attorney, without any hearing, inquiry, or investigation into the facts, and that the third order of court, signed by the district judge, was prepared by Ed Hall or his attorney at Austin, and that the petition, report of sale, and the three orders were prepared and used by Ed Hall for the purpose of perpetrating a fraud upon the Guaranty State Bank, its organizers and incorporators, and thereby a fraud was perpetrated upon the judge.

The record shows that the contract of sale was agreed on before the petition was presented to the judge by Ed Hall and his attorney, for authority to consummate it, and that a copy of the contract was attached to the petition. The effect of the orders of court were simply to grant such authority and to confirm the sale after a report of it was made. No proof was offered to show that Ed Hall practiced any deception on the court or introduced any false testimony in order to procure the orders. The effect of the contention of appellees is simply this, that the court in making the orders merely approved and confirmed the contract that had already been agreed upon by the parties, without hearing any further evidence as to whether or not the sale should be made. We fail to perceive how it can be said that, by reason of that fact alone, a fraud was practiced upon the court in procuring said orders, even though it be further said that in consummating the sale in obedience to the orders the commissioner misrepresented the value of the assets and thereby induced the appellees to purchase them.

It is further insisted that there is no evidence to support the findings by this court upon original hearing, to the effect that during the fall of the year 1922, J. L. Chapman, commissioner of insurance and banking, who had succeeded Ed Hall, after an investigation of the Guaranty State Bank, called attention of its officers to the fact that many of the bills receivable held by the bank, which had formerly belonged to the Traders' State Bank and which had been purchased by the Guaranty State Bank, were worthless, and demanded that the stockholders of the Guaranty State Bank pay into its capital the sum of $25,000 in order to replace such worthless notes; and that, after appellees had, during the fall of 1922, discovered that the banking commissioner had defrauded them in the sale in April of the same year, they elected to retain the worthless notes of the Traders' State Bank theretofore purchased from Ed Hall, banking commissioner. The contract of purchase and sale of the assets of the Traders' State Bank by the Guaranty State Bank was dated April 15, 1922, as recited in our original opinion. Paragraph 7 of appellees' petition, upon which the last trial of the case was had, contains the following allegations:

"Plaintiffs say that a few months after the organization of said Guaranty State Bank, and after the transfer by defendants to said Guaranty State Bank of the assets of the old Traders' State Bank, J. L. Chapman, the commissioner of insurance and banking, for himself and the other defendants, on or about the ——— day of December, 1922, represented to said Guaranty State Bank that further investigation by him or his assistants had disclosed the worthless condition of part of the paper which had been transferred by defendants to said Guaranty State Bank as aforesaid, although such worthlessness was at all times known to defendants, or should have been known to them, and said J. L. Chapman, commissioner, for himself and the other defendants, insisted that the stockholders of said Guaranty State Bank put into said bank the further sum of $25,000 in cash to take the place of said worthless paper, and said Guaranty State Bank and its stockholders protested against putting into said bank any sum of money to take the place of any worthless paper which had been transferred to said bank of defendants, insisting at the time that the state banking board should take care of any of said paper that might be found to be worthless, and, after some negotiations with said J. L. Chapman, commissioner, and upon the personal assurance of said J. L. Chapman, commissioner, that there was no other bad paper in said assets, and that there would be no further payment demanded from said stockholders to take the place of any of said paper that might be found to be worthless, and in order to have no friction with said J. L. Chapman, commissioner, and to avoid any possible complications that might result from refusing said stockholders did deposit in said bank the

further sum of $25,000 in cash, and said bank continued to operate until thereafter closed as aforesaid."

In addition to those allegations, appellees further alleged that, after the organization of the Guaranty State Bank, no bad loans were made, and all of the paper taken by them was worth 100 cents on the dollar. The statement in our original opinion, to the effect that those allegations were evidently made for the purpose of meeting any possible objection that plaintiffs did not return, or offer to return, to the commissioner the assets of the Traders' State Bank, is hereby withdrawn, since appellees say in their motion that such was not the purpose of those allegations.

In addition to those allegations in the pleadings, the record shows that Mr. Sibley, one of the organizers of the Guaranty State Bank, on August 5, 1922, wrote a letter to the president of the bank, stating that the bank was then in a critical condition, and requested the president to tell Bishop and Barlow, who were formerly officers of the Traders' State Bank and then officers of the Guaranty State Bank, that "we cannot make any more loans, and that they have got to assist us in collecting some of the loans they have made," with the further statement that the writer was willing to keep Bishop and Barlow in the new bank, "provided they assist us in cleaning up the mess which they have gotten us into." Practically all the appellees testified that all the loans made by the Guaranty State Bank were worth 100 cents on the dollar.

On September 30, 1922, Mr. Chapman, banking commissioner, wrote a letter to the board of directors of the Guaranty State Bank, stating that he had received a report of a recent examination of the bank, and it was "necessary that a majority of the board come to his office to discuss means to place the bank in a more acceptable condition." On October 5, 1922, Mr. Chapman wrote the board another letter, stating that the bank had "unquestionably a serious amount of losses, hazardous, and doubtful loans." And in the same letter the commissioner informed the board of his intention to levy a stockholders' assessment of 100 per cent. and require them to remove a like amount of paper from the assets of the bank, with the statement that the bank examiners had classified more than that amount as hazardous and doubtful loans. Other letters of like tenor from the commissioner to the board, of date prior to December 14, 1922, were also introduced. On October 3, 1922, Sibley wrote to Chapman that his letter to the board of directors, of date September 30th, was a shock to him, because, when he agreed to buy $50,000 stock in the Guaranty State Bank, he and Hall,

the former commissioner, had a "man to man" agreement that the Guaranty State Bank "should have ample time to work out any objectionable assets that the new institution might have." On December 14, 1922, Chapman addressed another letter to the board of directors, referring to an agreement that he had made with them by the terms of which they were immediately to remove $25,000 of notes classified as losses, and another $25,000 by February 10th, and that the balance of the $38,000, which the banking examiner had classified as losses, was also to be eliminated by cash payment or by acceptable guaranty. That letter also contained the following:

"It is further agreed on my part that after the removal of the $50,000 of paper as above set out and the placing of the remaining $38,000 in satisfactory condition, that, so long as the bank's affairs are being given close and constructive attention, this department would not be inclined to further severely criticise or demand the removal of any additional paper that was taken over from the defunct Traders' State Bank until after one year from this date."

In the same letter the commissioner stated that he was inclosing a list of notes which had been classified by the banking examiners as doubtful, aggregating more than $100,000. The letter further called attention to the custom of the banking department to demand the strengthening of doubtful paper, and added:

"This requirement is waived in your favor upon conditions enumerated in the foregoing paragraphs, for the reason that the Guaranty State Bank inherited the major part of this doubtful paper by taking over the accepted assets at par of the Traders' State Bank."

While we believe that the testimony supports the findings of this court, to the effect that the appellees discovered the worthless character, or at least a large part, of the notes of the Traders' State Bank during the *fall* of 1922; yet, if mistaken in that, we believe there can be no doubt that such discovery was made about the middle of *December*, 1922, and that such difference of time of discovery would not be material.

Many other criticisms of the findings of this court as shown in the original opinion are made in the motion for rehearing as being unsupported by any evidence. In order to fully answer all of those criticisms, we would be required to set out so much of the statement of facts as we feel would unduly lengthen this opinion. However, we have, after carefully considering all of those criticisms in connection with a further examination of the record, reached the conclusion that they are without merit.

The motion for rehearing is overruled.