[Civil No. 3364. Filed May 31, 1933.]

[22 Pac. (2d) 409.]

In the Matter of the Estate of THE ARIZONA BANK, a Corporation, Insolvent. QUALITY OIL COMPANY, a Corporation, ROSS H. BLAKELY, BURT OGBURN et al., Appellants, v. Y. C. WHITE, Superintendent of Banks of the State of Arizona and *Ex-officio* Receiver of THE ARIZONA BANK, a Corporation, Insolvent, Appellee.

Messrs. Windes & Miller, for Appellant Quality Oil Company.

Mr. Herbert B. Shoemaker and Mr. Frank H. Swenson, for All Other Appellants.

Messrs. Moore & Shimmel, for Appellee.

ROSS, C. J.—This appeal involves the power and authority of the superintendent of banks as *ex-officio* receiver to sell *en masse* at private sale the assets of the Arizona Bank, an insolvent, and to compromise certain claims or demands against the bank's directors and stockholders to whom, under the guise of dividends, were paid large sums of money from the bank's capital and assets; and also to compromise a claim for stockholders' liability. The offer of purchase and compromise made to the superintendent comes from the last-named group, and associates, in the form of a written proposal by the Northern Arizona Securities Company, an Arizona corporation, as their representative. The proposed contract of purchase and settlement was by the superintendent of banks duly submitted, together with a petition asking that it be approved, to the superior court of Maricopa county, Judge G. A. RODGERS sitting, and, after due and ample notice and a hearing lasting two days during which many witnesses were examined, was approved by the court and the superintendent ordered and directed to accept and execute it.

The creditors and depositors of the insolvent bank are between 7,000 and 8,000 in number. The appellants, approximately 130 in number, are the persons or concerns who appeared at the hearing and objected to the contract and to its being approved or carried into execution.

Prior to December 18, 1930, the insolvent carried on a commercial banking business under the name of the Arizona Central Bank, with headquarters at Flagstaff and branches at Winslow, Williams and Kingman. It had an issued and outstanding capital stock of 5,000 shares of the par value of $100 per share owned and distributed as follows: 3,845 by First Securities Company, Limited, a California corporation; 363 by Ellen A. Brophy; 90 by George Kingdon; 273 by J. S. Douglas; 185 by Lulu H. Rob-

inson; 86 by E. A. Haight; 86 by C. J. Walters; 27 by C. B. Wilson; 25 by Katherine M. Wilson; 10 by Charles B. Wilson, Jr.; and 10 by James Mars Wilson. On said day the First Securities Company, Limited, sold or pretended to sell, its 3,845 shares of the capital stock of the bank to one Leo M. Meeker, who as a part of the consideration agreed to reduce the capital stock from $500,000 to $250,000, its surplus from $250,000 to $50,000, and its undivided profits by $125,000, making a $575,000 reduction in capital and assets, and to distribute said sum to the stockholders above named by way of dividends at the rate of $115 per share. On that day, at a special meeting of the stockholders of said bank, the president thereof (who was also the president of the First Securities Company, Limited) resigned and Leo M. Meeker was elected president in his place and a director of the bank, and the contract to reduce the stock, the surplus and undivided profits, as above stated, was by the stockholders and directors duly approved, as was also the "dividend" payments. The dividends on the 3,845 shares of stock paid to Meeker were passed on to the First Securities Company, Limited, and others, Meeker being financially irresponsible and a mere figurehead.

Under the new organization the bank moved its headquarters to Phoenix and continued to operate with branches at Flagstaff, Winslow, Williams, Kingman and Chandler, until June 24, 1932, with all the appearance of solvency. However, on the last-named date it was discovered that the bank was hopelessly insolvent and it was taken over by the then superintendent of banks, S. W. Ellery, who in turn was succeeded by Lloyd Thomas, the present superintendent's predecessor.

In September, 1932, Lloyd Thomas, superintendent, commenced a suit in the superior court of Maricopa

county, being numbered 37829–C on the docket of said court, against the Security First National Bank of Los Angeles, First Securities Company, Limited, Northern Arizona Securities Company, Grand Canyon Sheep Company, Three V Livestock Company, Colin Campbell Livestock Company, H. J. McClung, C. B. Wilson, C. J. Walters, E. A. Haight, and Leo M. Meeker, alleging that they jointly and severally converted the $575,000 taken from the bank's assets and capital; and included in said suit a cause of action against the First Securities Company, Limited, for stockholders' liability, on the theory that it had sold the 3,845 shares of stock to Meeker while the bank was in a failing condition.

On December 20th, George W. Miller and wife, Allen E., John A. and Edwin E. Ware, Louis L. Wallace and K. W. Davidson, of Kingman, Mohave county, who had been induced by Meeker to purchase 170 shares of stock in said bank at $150 per share, commenced an action in said Mohave county (which was later removed to Maricopa county and docketed as cause No. 38794–B) against the Arizona Bank, the superintendent of banks as receiver, and the same defendants as in cause No. 37829–C, praying that their contracts of purchase be canceled; that they be repaid what they had paid for stock, to wit, $150 per share, and, alternatively, should they be held to be stockholders, that they recover of defendants damages in the sum of $100 per share to cover the statutory liability thereon; or for the total sum of $42,500.

The Northern Arizona Securities Company in the contract has agreed to pay to the superintendent of banks, in compromise and settlement of these two suits, and for all the assets of the insolvent, "except (a) cash on hand as of December 17, 1932, in the sum of $105,881.97; (b) securities pledged as collateral for the payment of deposits of public moneys; (c) stockholders' liability and payments on account

thereof, and (d) furniture and fixtures of said bank in its head office at Phoenix and its branch at Chandler, Arizona," the sum of $850,000: $50,000 in cash, and the balance if and when the contract and settlement are approved by the court, with this reservation: That $42,500 be impounded pending the determination of the case of Miller et al. as security for any judgment that might be obtained therein against the purchaser and its associates.

The most serious contention made against the compromise and settlement, and one that we confess has given us some trouble, is that the cause of action alleged in the Thomas suit is not an asset of the bank but one belonging to the then existing creditors and depositors, who alone, it is asserted, may sue therefor.

Under no view of the facts as stated can the act of the directors and stockholders appropriating $575,-000 of the bank's assets be justified. It was not a dividend, since dividends can be paid from profits only. If it were dividends, there would have been no occasion to surrender shares of stock for cancellation. It was not a sale of stock to the bank but to Meeker for Meeker's promise. It was a most brazen and frank scheme, with no semblance of legality, to pay to the stockholders $115 per share for their stock and at the same time possibly release them from the statutory liability. It was stepping out from under a liability with a vengeance to the bank and its creditors. The assets of the bank were a trust fund for its creditors and not for its stockholders. Michie, Banks and Banking, vol. 2, p. 102 § 10c.

Section 246 of the Revised Code of 1928, found in the banking act, provides that "all of the property and assets of said bank, wherever situated," shall forthwith vest in the superintendent of banks upon his taking charge of its property and business. We think the property converted by the stockholders

and directors of the bank was a trust fund for the creditors in general and not any special class of creditors. One of the tests, or perhaps *the* test, in determining whether a cause of action is in the receiver of an insolvent bank, or in individual creditors, depositors or stockholders, is the ownership of the sums to be recovered; and if such sums belong to the bank they are recoverable by the receiver or, on his refusal, by creditors, depositors or stockholders. *Douglass* v. *Dawson,* 190 N. C. 458, 130 S. E. 195. In this case the action was by the executrix and assignees of a depositor of the insolvent bank against the directors of said bank to recover damages for loss sustained through their negligence and wrongful acts. The court held that the cause of action belonged to the receiver of the insolvent bank, and not to the depositor, and said:

"The facts alleged in the complaint do not show any wrong peculiar to plaintiffs or to Miley Jones, to whom the certificate of deposit was issued. There is no allegation that defendants or either of them made any representation to her individually as to the condition of the bank, prior to the making of the deposit, originally, or while the same was in the bank. The statements alleged to have been published, showing that the bank was solvent and worthy of credit were not made to Miley Jones alone but, as alleged in the complaint, to Miley Jones and the public. The loss which plaintiffs have sustained by reason of the insolvency of the bank is an injury to them, in common with other creditors and depositors of the Farmers' Bank & Trust Company. The facts alleged in the complaint do not constitute a cause of action against defendants upon which plaintiffs alone may recover. Sums recovered of defendants, as damages for the negligence and wrongful acts alleged in the complaint as the cause of the insolvency of the bank, would be assets of the bank, and should be recovered by the receiver, as the representative of all who have claims upon or interest in such assets."

The rule was stated in *McTamany* v. *Day,* 23 Idaho 95, 128 Pac. 563, where the court said:

"It is stated in the recent work of Tiffany on Banks and Banking, page 304 et seq., as follows: 'The officers being liable to the corporation for losses caused by their fraud, gross negligence, or wilful breach of duty, this liability may be enforced by or for the benefit of the creditors when the corporation becomes insolvent. . . . It follows that the remedy of the creditor is not by an action at law against the guilty officers. (Citing many authorities.) . . . Of course, where the corporation is in the hands of a receiver or assignee, as the representative of all concerned, he is the proper party to maintain an action.' However, there are some decisions holding to the contrary."

In *Webb* v. *Cash,* 35 Wyo. 398, 250 Pac. 1, it is said:

" . . . By the great weight of authority, it is held that the directors of a bank are liable only to the corporation, whose agents and trustees they are, for violation or neglect of their official duty, and that, accordingly, no action lies against them by an individual creditor, in the absence of a specific statute authorizing it, but that the right of action belongs to the corporation as such, or to its receiver, and must ordinarily be brought by it or him. Some of the cases deny such action to a creditor, on behalf of the corporation, even where the corporation itself or the receiver refuses to bring the action. [Citing cases.]"

In a situation very much the same as here, in *Frederick* v. *McRae,* 157 Minn. 366, 196 N. W. 270, the court said:

"The unlawful payment of dividends to the stockholders, if such there was, constituted a violation of the duty of every director participating therein, redress for which must be sought by the corporation itself or by its representative for the benefit of the bank. A depositor could in no manner maintain such an action, because the directors were in no way dealing with him. The element of deceit would be entirely wanting. . . .

"The assets of this bank were *in custodia legis*. The receiver might, under the direction of the court, bring suit to collect, compound, or sell all claims belonging to the bank."

See, also, Michie, Banks and Banking, vol. 2, p. 65, § 83.

The property misappropriated by the defendants in cause No. 37829–C (the Thomas case), and the damages to be recovered therefor, belong to the bank —to be sure, in trust for the depositors and creditors of the bank and finally for the stockholders, but for all of them and not for some of them exclusively.

The objectors contend that the rule stated and followed in *Republic Life Ins. Co.* v. *Swigert*, 135 Ill. 150, 25 N. E. 680, 12 L. R. A. 328, and in *Mitchell* v. *Banking Corporation*, 83 Mont. 581, 273 Pac. 1055, should control. It seems in the first case that certain stock subscribers who had paid twenty per cent. of their subscriptions were permitted to surrender their certificates and were given in lieu thereof fully paid certificates for one-fifth of their subscriptions. It was held that the right of action for balance of unpaid stock subscriptions under the circumstances was in the creditors of the insolvent and not the receiver. The transaction was valid and lawful so far as the company was concerned. It was not *ultra vires*. The company had a right while it was solvent to purchase its own stock. A very different situation from the one we have here. In the Mitchell case the question was whether the statutory liability of stockholders was an asset of the bank, or for the benefit of the creditors of the insolvent bank, and the court held, construing the statutes of that state, that such liability belonged to the creditors.

Michie, Banks and Banking, volume 3, page 151, section 98, says: *"The stockholder's statutory liability* is not generally enforceable by the receiver of an insolvent bank unless he is especially authorized

by statute to enforce the same. But he is generally given such authority.'' He has such statutory authority in this state.

The general powers of the superintendent of banks over the assets of an insolvent bank in his charge are set forth in section 246, *supra*, as follows:

''Upon taking possession of the property and business of any bank the superintendent may do such acts as are necessary to conserve its assets and business, and shall liquidate the affairs thereof as hereinafter provided. He shall collect all money and debts due and claims belonging to it, and for such purposes is authorized to bring and defend actions and other proceedings in this state and elsewhere; and upon the order of the superior court of the county in which it is doing business, may sell or compound all bad or doubtful debts, and on like order may sell its real and personal property on such terms, at public or private sale, as the court shall direct, and if necessary shall enforce in this state or elsewhere the liabilities of its stockholders.''

As to the stockholders' liability and the right of the receiver to enforce it, see, also, section 11, article 14, of the Constitution, and section 227, Revised Code 1928.

It will be noted that the superintendent takes complete title to all the assets of the insolvent and that he is given the right, under the supervision of the court, to sell or compound all bad or doubtful debts, and to sell the real and personal property of the insolvent on such terms, at public or private sale, as the court may direct. The trial court, after investigating the character of the cause of action involved in cause No. 37829–C (the Thomas case), and after hearing evidence as to the value of the general assets of the insolvent, ordered the superintendent of banks to accept the proposal of compromise and settlement. While it seems to us that plaintiff would be almost certain of obtaining a judgment against the stock-

holders and directors who converted the $575,000 of the assets of the bank, yet we have but one side of the case and there may be two sides to it. It is also very probable the superintendent of banks would be able to recover from the stockholders their double liability on the 3,845 shares sold to Meeker. Of course, that is not certain. Should judgment be ultimately obtained for these sums, it would not be soon and only after long and bitter litigation, and then whether collected or not would depend upon the financial ability of the judgment debtors.

The court heard the evidence of many citizens familiar with the bank and its operations, assets, securities and collateral, the great expense of looking after the livestock, principally sheep, and concluded that the sale of the assets, at the price and on the terms indicated, *en masse,* at private sale, was for the best interests of the insolvent and its creditors and depositors and ordered the superintendent to proceed with the execution of the contract. While the face of the claim for damages in the Thomas suit and the book value of the assets are very much greater than the sum offered in compromise and settlement, the creditors and depositors have generally indorsed the compromise and settlement. Indeed, of the more than 7,000 creditors, only approximately 130 have objected to this settlement. On the showing made the learned trial judge was convinced that the settlement should be carried out, and we are not satisfied that he was wrong. In fact, we think, under the circumstances, it is best for all concerned.

One of the objectors makes the point that no personal service of the hearing of the petition for approval of contract was given to the creditors. This, however, as we conceive it, was not necessary. The proceeding was purely *ex parte.* It was not necessary that the creditors be notified either personally or constructively. The receiver represented all the

creditors and depositors at such hearing. *Fifer* v. *Williams*, (C. C. A.) 5 Fed. (2d) 286; *Sawyer* v. *Ellis*, 37 Ariz. 443, 295 Pac. 322.

It is also objected that the superintendent had no authority to compromise litigation. An inspection of section 246, *supra,* we think completely refutes that contention.

It is also claimed that the superintendent was without authority to sell the assets of the bank at private sale or *en masse.* Private sale is authorized by the statute. Whether assets should be sold *en masse* or in separate parcels depends upon which method will bring the most money. There was no showing that more would be realized by sales in parcels. The practice of selling assets *en masse* is recognized in *Fifer* v. *Williams, supra,* and in *Chapman* v. *Guaranty State Bank,* (Tex. Com. App.) 267 S. W. 690; Id., (Tex. Civ. App.) 297 S. W. 545. Selling *en masse* has the advantage of stopping all costs and expenses of administration and no doubt frequently brings more than if sold by parcel.

There is also some objection to that feature of the contract that impounds $42,500 pending the determination of the case of Miller et al. against the stockholders and directors and others. This is one of the conditions of the compromise, the necessity and advisability of which was, we think, within the discretion of the superintendent of banks, subject to the orders of the trial court.

We have come to the conclusion that the order and judgment of the lower court should be affirmed. It is so ordered.

McALISTER, J., concurs.