13682

DUNBAR v. FANT ET AL.

(170 S. E., 460)

*Messrs. Johnson & Johnson,* for appellant, 

*Messrs. Nicholls, Wyche & Russell* and *R. E. Whiting,*
for respondent, Albert S. Fant,

*Messrs. Evans & Galbraith* and *J. N. Holcombe,* for re-
spondent, Fidelity & Deposit Co. of Maryland,

August 24, 1933.

The opinion of the Court was delivered by MR. CHIEF
JUSTICE BLEASE.

Basing his action upon the statutory enactments now con-
tained in Sections 7844 and 7852 of the Code, the appellant
sought to recover of the respondents Fant, formerly the
State Bank Examiner, and the surety on Fant's official bond,
damages alleged to have been sustained by the depositors
and creditors of the Cowpens Security Bank, because of the

failure of Fant "to well and truly perform the duties of his office." The complaint alleged that Fant "failed to perform his duties, in that he failed to remedy or discontinue" certain violations of the banking laws, discovered by him in the conduct of the bank, and that, "after the said bank became insolvent and the dishonest conduct of the bank continued, he failed to take and retain possession of the assets of said bank, and place the affairs of same in the hands of a receiver"; and that "said nonfeasance on the part of the defendant, Albert S. Fant, and failure to well and truly perform his duties as required by law constitute a breach of the condition of the bond."

After the evidence in chief of the appellant had been received, and without any evidence on the part of either of the respondents having been offered, the trial Judge, Hon. W. H. Grimball, directed a verdict in favor of both of the respondents. He placed his order on these grounds: First, the State Bank Examiner was not required, under the provisions of Section 7844, to remedy or discontinue any violation of the banking laws, discovered by him, his duties in that regard being only to give notice of such violations to the officers and directors of the bank. Second, the examiner, under the provisions of Section 7852, was given discretionary power in the matter of taking over the assets of a bank found to be insolvent, or when its business was so dishonestly and fraudulently conducted as to jeopardize the interests of the depositors, creditors, or stockholders. Third, that the examiner was not liable for damages to those for whose benefit the appellant sued, except upon proof of bad faith or corruption on the part of the examiner, and there was no evidence to show such bad faith or corruption.

The provisions of Section 7844 were enacted in 1906. Thereby, it was made the duty of the examiner to make a thorough examination of a bank's affairs. For that purpose, he was given authority to summon and examine, under oath, any person connected with the bank. He was required to make and file a full report of his findings in the office of

the State Treasurer, setting forth therein any violation of the banking laws, and such full summary of the bank's affairs as would be necessary for the protection of the rights of the depositors, stockholders, and creditors, and the bank so examined was to be furnished a copy of the report.

The sentence in the section, depended upon by the appellant to sustain his position that the examiner was required to remedy, or have discontinued, violations of the banking laws, discovered by him, is, because of apparent failure to be properly punctuated, somewhat confusing. It reads thus: "It shall also be the duty of said bank examiner to forthwith bring to the attention of the said banks all such violations of the banking laws of this State and that the same be remedied or discontinued." If the word "and" is eliminated from the sentence, and in its place a comma is inserted, the meaning intended would be entirely clear. The sentence would then read as follows: "It shall also be the duty of said bank examiner to forthwith bring to the attention of the said banks all such violations of the banking laws of this State, that the same be remedied or discontinued." We may properly consider the sentence so rearranged, for it is the duty of the Court, by such change, to properly seek the legislative intent.

A careful examination of all the statutes pertaining to the duties of the State Bank Examiner support the conclusion of the Circuit Judge that the duty did not rest upon the examiner, under Section 7844, to correct or remedy violations of the banking laws discovered by him, but that it was the legislative intent that the directors of the bank should correct and remedy the violations reported to them by the examiner.

The fact that the examiner was to report such violations to the bank is an indication that the Legislature intended the board of directors to act in such matters. The examiner, supposed to be well acquainted with the banking laws, and informed as to when they had been violated, was, naturally, looked upon as the proper person to call attention of such

violations to the directors, who, as it is well known, are not always familiar with the banking laws.

Surely, if the General Assembly intended that the examiner should perform the difficult task of correcting and remedying the violations of the banking laws, some effective means or method would have been bestowed upon him, that he might have accomplished the desired ends. We have not seen where such powers were given that official. Nowhere was he given power to enter a criminal prosecution, or to direct that one be instituted; no authority to enter a civil suit was vested in him; no power was given to remove the offending officer or employee; and he was not authorized to close a bank, or to take steps to have it closed, simply because some one or more of the banking laws had been violated. All the suggested methods of correcting and remedying violations, which the lawmakers could have placed in the hands of the examiner, rested with the directors.

Another very significant thing, tending to support the stated view, appears to us. The provisions of Section 7844 superseded that part of the Act of 1896, appearing later as Section 1770 of Volume 1 of the Code of 1902. In that law, the examiner did have a little power toward correcting and remedying some violations of the banking laws, for, therein, he was authorized to report such violations to which any penalty was attached to the Attorney General, "with instructions to enforce such penalty by the proper proceedings." In the Act of 1906, later Section 7844, that little power, for some reason, was taken from the examiner.

We are aided in ascertaining the legislative intention, in the language used in Section 7844, by a recent Act of our General Assembly, that of 1929 (36 Stats., 127), set out as Section 7877 of the Code, which relates to the duties of certain officers and the directors of a bank after the examiner has sent to the bank a copy of the report of his examination. Obviously, the former law, Section 7844, was deficient in certain respects, necessary to advise the directors of a bank of law violations occurring in their institution. Under

that law, the examiner was only to send his report to "the bank," and, so far as the law stated, that procedure on his part ended the matter. Naturally, if the officer of the bank who received the report was the offending official, and he desired his law violations not to be known to the directors, they did not receive the information contained in the examiner's report. There was no provision in the old law either that the directors were required to review the report, or to take any action thereon. The Act of 1929 directed the examiner to send the report of his examination to the "cashier of the bank," a specified official, who was required, within thirty days of its receipt, to call a meeting of the directors for the purpose of reviewing the report, and for taking such action as was necessary. The president or cashier of the bank was charged with the duty of acknowledging to the examiner that the report had been received, and had been submitted to the directors at a board meeting, and that the same had been duly considered and the record of the action taken made upon the minutes. The directors were required to inform the examiner that they had reviewed the report, but they were not required to even tell the examiner *what action* thereon they had taken. No provision was made as to the examiner following up any action taken by the directors. Again, there was failure to vest in the examiner any power to remedy, or to have discontinued, law violations. Clearly, then, the General Assembly, in its very last enactment with reference to the subject, looked to the directors, and not to the examiner, for the remedying and discontinuance of violations of the banking laws.

We are also of the opinion that the trial Judge properly construed the law now contained in Section 7852 of the Code, enacted in 1911, in his holding that the duties imposed upon the State Bank Examiner, as to taking over and retaining possession of the assets of a bank, under certain circumstances, were *discretionary*. The effect of the holding was that, in the performance of such duties, the examiner was to act in a judicial, and not in a ministerial,

capacity. The position of the appellant would require a holding that, under the provisions of the law, the acts of the examiner were merely ministerial.

. It is well recognized, of course, that the same official may have duties both ministerial and judicial; an officer with both duties being usually termed a quasi-judicial officer. In some instances, under the laws relating to the duties of the State Bank Examiner, that officer had to act in a ministerial capacity, for instance, in the filing of his report of the examination of a bank with the State Treasurer, and sending a copy thereof to the bank. No question is made in this case as to the performance of those ministerial duties on the part of the respondent, Fant. In other instances, the examiner clearly acts in a judicial capacity, and, we think, he was to so act in the matters relating to the taking over of the assets of a bank and procuring the appointment of a receiver therefor.

Much has been written as to the distinction between the judicial and ministerial duties of public officers. We shall not undertake to go at length into the subject. A very clear and concise declaration thereabout is that of Mr. Justice Wagner, of the Supreme Court of Iowa, in the very recent case of *Rehmann et al. v. City of Des Moines et al.,* 204 Iowa, 798, 215 N. W., 957, 959, 55 A. L. R., 430, as follows: "Official action is judicial where it is the result of judgment or discretion. It is ministerial when it is absolute and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion."

One even shorter, and perhaps equally as clear, was that of Mr. Justice Richardson, speaking for the highest Court of this State, in the case of *Reid v. Hood et al.,* 2 Nott & McC. (11 S. C. Law), 168, 10 Am. Dec., 582, decided in 1819, where he said: "The essential and characteristic distinction between a judicial and a ministerial officer, is, that the former is to give judgment, which requires perfect free-

dom of opinion; but the latter is to execute, which supposes obedience to some mandate prescribing what is to be done; and leaving nothing to opinion."

The announced principles were later approved in the case of *McCall v. Cohen,* 16 S. C., 445, 42 Am. Rep., 641.

With the distinction between judicial and ministerial duties in mind, let us analyze Section 7852, for the purpose of showing that, in the matter of proceeding to take over the assets of a bank and having a receiver appointed therefor, the State Bank Examiner was therein "to give judgment, which requires perfect freedom of opinion," and his duties in that regard were not simply ministerial, for they did not involve "merely the execution of a set task."

In the section, the examiner was given *"full power"* to take and retain possession of all the assets and property of a bank, under certain circumstances, after ascertaining certain matters, and taking certain preliminary steps. First, the examiner must *find* that the bank was insolvent, or that its business was being so dishonestly and fraudulently conducted as to jeopardize the interests of the depositors, creditors or stockholders. The word "find," as used in the statute, clearly has the meaning usually given to that word in referring to the acts of a judicial, or quasi-judicial, officer or body. In that legal sense, the word means "to determine and declare an issue of fact by its verdict or decision, as a jury or Court." Webster's New International Dictionary; *State ex inf. Barker v. Crandall,* 269 Mo., 44, 190 S. W., 889, 25 C. J., 1132.

The solvency or insolvency of a bank is very much a judicial question, one which has given this Court, as well as the Courts of many other jurisdictions, much difficulty. The definition of the insolvency of a bank, as laid down by this Court, one which oftentimes it has been found right hard to follow, was declared in *Ex parte Berger,* 81 S. C., 244, 62 S. E., 249, 252, 22 L. R. A. (N. S.), 445, where it was said: "A bank is insolvent when, from the uncertainty of being able to realize on its assets, in a reasonable time, a

sufficient amount to meet its liabilities, it becomes necessary for the control of its affairs to pass out of its hands."

In discussing a case very much similar to this, the Court of Appeals of Missouri, in the case of *State ex rel. Funk v. Turner,* 17 S. W. (2d), 986, 991, said: "The determination of the question of insolvency of a bank is a difficult one, and the bank commissioner and his assistants must necessarily often have much difficulty in determining what action they should take. * * * "

Certainly, it required the ascertainment of many facts, and an inquiry into many legal matters, for the State Bank Examiner to have determined when "it becomes necessary for the control of a bank's affairs to pass out of its hands." It required, too, the ascertainment of many facts, and the determination of legal questions, before the State Bank Examiner could find that a bank was so fraudulently conducted as to jeopardize the interests of the depositors, creditors, or stockholders. Certain dishonest conduct of an officer of a bank, the taking of usurious interest, as an instance, may inure to the financial gain of the stockholders, without injury to the depositors or creditors. The fraudulent conducting of a bank was not sufficient alone, under the statute, to justify the examiner in proceeding to take over the assets of the institution. In addition to the fraudulent conduct, the examiner had to *find* that such conduct would jeopardize the interests of one of the classes having an interest in the institution. The financial interest of depositors, creditors, or stockholders might possibly be protected the better by allowing the bank to continue, rather than to have it cease its operations.

But even if the examiner found that the institution was insolvent, or that its business was so fraudulently conducted as to jeopardize the interests of the depositors, creditors, or stockholders, still he could not, *alone,* proceed to take over the assets of the institution. His next step in the proceeding, *after his finding,* was to have a "consultation with the State Treasurer." The statute is very indefinite as to what

was the duty, if any, of the State Treasurer in the premises. All that official apparently could do was to "consult" with the examiner. The use of the words "consultation with the State Treasurer" strengthens the view that the examiner was required to act, not only with discretion, but with very great discretion, before he proceeded in the next step toward the closing of the bank, on any of the grounds mentioned in the statute. "Consultation," as defined by Mr. Webster, means "the deliberation of two or more persons on some matter; a council or conference to consider a special case." The General Assembly, therefore, evidently intended that the examiner, even after he reached the opinion that the bank was insolvent, or that its affairs were being so fraudulently conducted as to jeopardize the interests of the depositors, creditors, or stockholders, before proceeding to do anything looking to the closing of the doors, should confer and deliberate the matter with the State Treasurer—indicating that the examiner was not to be hasty, but was to act with extraordinary care and prudence.

The next slow step of the examiner, after he had consulted with the State Treasurer, was to give under the law, a notice of at least two days to the directors of the bank, that he proposed to apply to a Circuit Judge for an order authorizing him to take over the assets of the institution. The intention of that provision, obviously, was to give the directors, not only the right to resist in the Court the application of the examiner, but a little longer time to convince the examiner that the application should not be made, that the matters complained of by him might be adjusted.

Not only the language of Section 7852, but that of Section 7844, ponts to the fact that the General Assembly intended that the examiner should act judicially, and not ministerially, in the matter of taking over the assets of a bank. In Section 7844, he was given the power to summon before him and examine, under oath, any and all persons connected with the bank, with the view of ascertaining its true condition, whether it was solvent or insolvent, whether its affairs were

being conducted honestly or dishonestly. The power to do these acts, ordinarily given to a judicial, or a quasi-judicial, officer strongly indicate that the lawmaking body intended that the examiner should at all stages, from the first step in his examination, until the last step of applying to a Circuit Judge for an order to take over the assets of the bank, act with the care, deliberation, prudence, and discretion of a judicial officer.

As we were aided in the construction of the language contained in Section 7844, by subsequent legislation, we are helped, also, as to the meaning of Section 7852 by a recent Act of our General Assembly, that adopted in 1929 (36 Stats., 199), appearing in the Code as Section 7855. That Act related to the appointment of receivers of banks closed for liquidation, and its main purpose, apparently, was to take from the State bank examiner some of his power, at least much of his influence, in the matter of naming receivers of insolvent banks. Therein, the General Assembly said: "That the above provisions [those as to the appointment of receivers] shall also apply to cases provided for in Section 7852, where the State Bank Examiner concludes to liquidate the bank found by him to be insolvent or conducted in such a manner as to jeopardize the interest of the depositors, creditors, or stockholders.

It is to be observed that in its reference to the powers, authority and duties of the examiner, in the matter of taking over the assets of a bank, as set forth in Section 7852, the Legislature used the word "concludes." One of the definitions of the word "conclude," as given by Mr. Webster, is "to form a final judgment," and in reading the Act of 1929, as well as the provisions contained in Section 7852, we are constrained to the opinion that the Legislature had the mentioned definition in mind, for it seems to harmonize with the legislative intention, expressed from time to time in all the statutes, relating to the duties of the examiner in taking over the assets of a bank.

We are further assisted as to the legislative intent, in the matter under consideration, by the Act of the General Assembly, approved May 16, 1933 (38 St. at Large, p. 489), entitled, "An Act to Provide for the Liquidation of Banks or Banking Institutions After a Conservator has Been Appointed." After, by its Act, approved April 14, 1933 (38 St. at Large, p. 296), abolishing the office of the State Bank Examiner and vested in the Governor plenary power and control over all banks, the General Assembly adopted the Act, approved May 16, 1933. In the first clause of the first sentence of the first section of that Act, the Legislature said: "When the Governor shall conclude, after advising and consulting with the Board of Bank Control, that any bank for which a Conservator has been or hereafter shall be appointed, is insolvent or in imminent danger of insolvency and it is necessary in order to protect the interest of depositors and creditors to liquidate such bank, he shall order the liquidation thereof." The words are quite similar to some used in Section 7852, and express very much the same purpose.

The Legislature, in referring to the powers, duties and authority of the Governor of the State as to the liquidation of a bank, has used the word "conclude," plainly showing that the Governor, in the matters over which he was given control, was "to form a final judgment," even after he had advised and consulted with the Board of Bank Control, as to what was best to be done "in order to protect the interest of depositors and creditors." Would it be contended that his Excellency, the Governor of the State, because he ordered, or failed to order, the liquidation of a bank, as prescribed in this act, in the absence of bad faith or corruption on his part, would be liable to depositors and creditors for losses sustained by them? The question answers itself in the negative, for surely the General Assembly has never intended that the Governor should be made personally liable for his erroneous exercise of the discretion vested in him.

One case only from our own decisions, that of *Branchville Motor Company v. Adden,* 158 S. C., 90, 155 S. E., 277, 279,

seems to be relied upon by the appellant in support of his contention that, under the provisions of Section 7852, the duty of the examiner, in the matter of taking over the assets of a bank, was a ministerial one. Some language of Mr. Justice Cothran, who wrote the opinion for the Court in that case, is quoted. Referring to what was then Section 3985 of the Code of 1922, now Section 7852, the learned jurist said: "Under it the interposition of the examiner was justified when, upon an examination of the bank, he found that it was insolvent or being dishonestly managed. He was directed then, upon consultation with the state treasurer and after obtaining an order from the circuit judge to that effect, upon due notice, to take and retain possession of all the assets and property of the bank, and then to apply to the court to have either himself or some one else appointed receiver to wind up and settle the affairs of the bank."

Appellant's position is that, when Mr. Justice Cothran used the word "directed," he meant to say that thereby the examiner was "commanded, ordered and required, upon consultation with the State Treasurer, to take and retain possession of the assets of the bank and place its affairs in the hands of a receiver."

The cited case does not touch any of the questions here for our determination. The action involved the right of depositors of an insolvent bank to bring suit for the enforcement of the statutory liability of stockholders to depositors, after the adoption of the Act of 1929 (36 Stats., 199), authorizing the receiver of such insolvent bank to bring an action of that character. The language quoted from the opinion of Mr. Justice Cothran, if it bears in any way upon any of the questions in the present case, would clearly, therefore, be *obiter*. But waiving that, we find no sound basis for the assumption that, when the word "directed" was used it was the purpose of the writer of the opinion to say that the examiner was "commanded, ordered and required" to proceed to take over the assets of the bank. The word "direct," as is stated in 18 C. J., 1043, "may be said to be of large use in

the language, and has been adopted into the law in many relations." It is used often as a verb with the meanings pointed to by the appellant, as shown by the cases cited by him, evidently taken from the notes appearing at page 1044 of 18 Corpus Juris. The holding that the word "directing" meant, in a certain instance, "requiring," was announced in our case of *Pelzer Mfg. Co. v. Cely,* 40 S. C., 430, 18 S. E., 790, 791. But we may say here, as was said by Mr. Chief Justice McIver in that case, that "undue stress is laid upon the word."

In the *Adden case,* Mr. Justice Cothran traced the history and effect of various statutes, touching the appointments of receivers for insolvent banks, and, incidentally, in the language quoted from his opinion, referred to the statutory provisions now contained in Section 7852. It is altogether probable, and more than likely, that, when he used the word "directed," he meant to say that Section 7852 "pointed out a course of proceeding with authority" to the examiner. See 18 C. J., 1044.

The appellant relies very much upon two cases decided by the Supreme Court of Idaho, namely, *State, Use of Mills v. American Surety Co.,* 26 Idaho, 652, 145 P., 1097, Ann. Cas., 1916-E, 209, and *State, Use of Allen v. Title Guaranty & S. Co.,* 27 Idaho, 752, 152 P., 189. In those, there appears to have been a holding to the effect that the bank commissioner of that state, in his duties relating to the taking over of a bank found by him to be insolvent, or being dishonestly conducted, was required to act sometimes in a ministerial capacity. The decisions rested upon the construction of the statutes of the state. We note that in those statutes there was the positive language: "The Bank Commissioner is hereby authorized, *and it is made his duty,* to take charge of such bank or trust company personally or by his deputy, or by special deputy appointed by the Commissioner for that specific purpose." (Italics ours.) Laws 1911, c. 124, § 74. The statute, therefore, is quite different from ours. But, even in those cases, the Supreme Court of Idaho held

as we have read the decisions, that in many respects, in reaching the conclusion that it was necessary for the commissioner to take over the assets of a bank, the duties of the commissioner were judicial, and not ministerial.

In a well-written annotation, beginning at page 663 of 38 A. L. R., following the reported decision of the Supreme Court of Arizona, in the case of *Deatsch v. Fairfield*, 27 Ariz., 387, 233 P., 887, in which the holdings were contrary in some respects to those of the Idaho cases cited by the appellant, the writer says: "Apparently in only one jurisdiction has a member of a governmental banking department, or his surety, been held liable personally for an act resulting from an erroneous decision." The jurisdiction mentioned was that of the State of Idaho, and the cases cited by the appellant from that state were discussed. It was pointed out, too, by the writer of that annotation that, in the *Mills case*, the bank commissioner was alleged to have "clearly abused his discretion to the extent of acting unfaithfully, in bad faith, and with a wilful design not to perform his duties."

It is somewhat interesting to note, in the same mentioned annotation, there is a reference to the Texas case of *Sanders State Bank v. Hawkins* (Tex. Civ. App.), 142 S. W., 84, wherein it was held that the superintendent of banking of that state was not liable for damages sustained by the stockholders of a bank, who claimed that the institution had been closed by the superintendent when he should not have taken that step. The Texas Court of Civil Appeals said: "It would be useless to clothe an officer with powers to judicially determine a question, and provide no means for enforcing his judgment. If he closed the bank at a time when it was not insolvent, and when its business was in all things being properly conducted, his action would be simply erroneous, and not in excess of his actual authority."

Having reached the conclusion that, under the provisions of Section 7852, the duties with which the state bank examiner was charged, as to taking over the assets of a bank

were judicial, and not ministerial, it follows that the respondent Fant was not liable to the depositors and creditors of the bank involved in this case, except upon it being shown that, in the performance, or nonperformance, of those duties, resulting proximately in the loss complained of, he was guilty of corruption, or bad faith, or was influenced by malicious motives. Logically, if Fant, the principal, was not liable, his co-defendant, the surety on his bond, was likewise not responsible.

It has been held in some cases, with reference to officers exercising quasi-judicial powers: "If the officer whose acts are complained of keeps within his powers, his motives, however corrupt and malicious they may be, may not be made a reason for holding him liable for the damages caused by his acts." But the better rule seems to be, as to quasi-judicial officers at least, that they are not exempt from liability when actuated by corrupt or malicious motives. 46 C. J., 1043. See, also, 22 R. C. L., 485. Logically, too, if the officer is liable, his surety is likewise liable to the extent of the sum named in the bond.

Very few cases in this State have touched the matter. In one, however, *Abrams v. Carlisle,* 18 S. C., 242, as to the acts of a trial justice, the judicial officer of an inferior Court, it was held: "In issuing his execution the trial justice acted judicially, and is not, therefore, liable in damages, unless it was done willfully or corruptly." Syllabus.

Also, in *McCall v. Cohen,* 16 S. C., 445, 42 Am. Rep., 641, it was held: "The Judge of an inferior Court is not liable in damages for an injury resulting to a party by reason of an error of judgment committed by such officer in the discharge of his duty, where the subject-matter was within his jurisdiction—except possibly, upon proof of a willful and corrupt motive." Syllabus.

The holdings in these cases seem to be in accord with the general rule, and appear to us to be reasonable and proper.

So far, we have refrained from discussing, or even attempting to review, any of the evidence in the case. This course we have followed, and will continue to pursue, for the reason that the result of all of our conclusions is such that it would be unfair to the parties to the litigation to express an opinion to any extent as to the probative value of the evidence. For our purpose, it is entirely sufficient to state that there was *some evidence* to show that the officers of the bank had violated the banking laws; that they had been exceeding negligent in the conduct of the affairs of the bank; that the institution was likely insolvent several months before it was closed; that the bank examiner, who did not consult with the State Treasurer, regarding the condition of the bank, properly, *may* have taken steps to close the institution before it was closed; and that some of the depositors, perhaps by the failure of the examiner to act earlier, sustained losses in deposits they made in the institution after it had become insolvent. It is entirely proper to say, however —duty demands it—that the trial Judge was correct when he held that there was a failure on the part of the appellant to show in any evidence presented that the respondent, Fant, acted corruptly, or in bad faith, or was actuated by malicious motives.

While agreeing with the trial Judge in his rulings on the important legal questions in the case, we find he committed error in one respect, that in a matter of practice. He should not have granted the motion of the respondents for a directed verdict in their favor. That motion, under the recognized practice, was not made at the proper time. It was entered upon the close of the appellant's case in chief, before any evidence of the respondents had been presented, and without any announcement that they would not offer evidence. The proper motion, if any, to have been made by the respondents at that time, was one for a nonsuit. If the motion for a directed verdict had been overruled, as to either or both of the respondents, the respondents, or either

of them adversely affected thereby, could have proceeded to offer evidence. The rule repeatedly recognized is in line with this holding.

"A motion for the direction of a verdict cannot properly be made until all the testimony on both sides which is to be submitted to the jury has been introduced." *Cantor v. Reserve Loan Life Ins. Co.*, 161 S. C., 198, 159 S. E., 542, 545; *McCown v. Muldrow*, 91 S. C., 540, 74 S. E., 386, Ann. Cas., 1914-A, 139; *McIntyre v. Cameron*, 124 S. C., 232, 117 S. E., 515.

The judgment of this Court is that the directed verdict in favor of the respondents be, and the same is hereby, reversed, and the cause be remanded to the Court of Common Pleas for Spartanburg County for such action as shall be proper.

MESSRS. JUSTICES STABLER, CARTER and BONHAM concur.