[Civil No. 3562. Filed January 6, 1936.]

[53 Pac. (2d) 415.]

FIDELITY AND DEPOSIT COMPANY OF MARY-LAND, a Corporation, Appellant, v. JOHN P. WARE, Appellee.

Messrs. Silverthorne & Van Spanckeren, for Appellant.

Mr. Frank H. Swenson and Mr. Herbert B. Shoemaker, for Appellee.

ROSS, J.—Sid W. Ellery was the state superintendent of banks from November 1, 1931, to August 4, 1932, and the defendant Fidelity & Deposit Company of Maryland was surety on his bond.

The plaintiff, Ware, brought this action against the surety to recover as damages the balance of his deposit, and the balances of the deposits of his several assignors (98 in number), in the Arizona Bank on June 24, 1932, the date said bank was taken over by Ellery for liquidation, claiming that it was through the negligence and unlawful acts of said Ellery in the performance of his official duties that said deposits were lost.

Originally the complaint claimed damages for the loss of deposits made in the bank after Ellery became state superintendent of banks, but on the day of trial the court permitted plaintiff to amend his complaint so as to include the deposits of plaintiff and his assignors made prior to Ellery's appointment as superintendent. The complaint alleges that while the surety bond is conditioned that Ellery will well, truly, and faithfully perform the duties of the office of *state bank examiner,* it was intended by Ellery and the surety company that it should be his bond as state superintendent of banks, and that the misdescription was merely clerical.

The complaint was drafted against both the superintendent Ellery and the surety, but the superintendent was not served with process and did not appear as a party to the case.

It is alleged that the liquidation of the bank was carried on by Ellery, after he took possession of it on June 24, 1932, until his successor, Lloyd Thomas, was appointed and by Thomas until his successor, Y. C. White, was appointed, and by White thereafter; that Thomas instituted an action in the superior court of Maricopa county against the directors and stockholders of the bank to recover the sum of $575,000 unlawfully and fraudulently taken from the bank on or about December 18, 1930, and to recover from the stockholders $384,000, their liability as such. (It appears from the evidence that this suit was compromised for $850,000, and that these plaintiffs have received, or will receive, therefrom 54 per cent. of their deposits.)

The answer put in issue, by denials, all the allegations of the complaint charging Ellery as superintendent of banks with failure well, truly and faithfully to perform his official duties.

The case was tried with a jury and resulted in a verdict and judgment for the amount of the surety bond, to wit, the sum of $20,000.

The defendant appeals and assigns a great number of errors. We will consider these assignments or such of them as we find necessary for a disposition of the case.

The facts generally may be stated as follows: Up to December 18, 1930, the Arizona Bank was known as the Arizona Central Bank and had its principal place of business at Flagstaff, Arizona, with branches at Williams, Winslow, and Kingman. Its authorized capital was $1,000,000, divided into 10,000 shares of $100 per share. Its issued, outstanding, and paid-in capital stock was $500,000. It had a surplus of $250,000 and undivided profits of $125,000. On December 18, 1930, the officers, directors, and

stockholders of the Arizona Central Bank took $250,000 of the capital, $200,000 of the surplus, and $125,000 undivided profits and paid it out to the stockholders for their stock; and on that day, or soon thereafter, changed the bank's name to the Arizona Bank, reduced its capital to $250,000 and its shares of stock to 2,500 at $100 per share, and transferred the bank to one Leo M. Meeker and certain of the former stockholders, who thereupon changed the bank's principal place of business to Phoenix, reduced the Flagstaff office to a branch and added branches at Chandler and McNary. Under this new and changed arrangement, the Arizona Bank opened for business in Phoenix on or about January 1, 1931. This was all done and accomplished under the supervision and with the approval of Ellery's predecessor, who continued in office until Ellery's appointment and qualification on November 1, 1931. When the bank opened for business in Phoenix and when Ellery came into office its capital was $250,000, and its surplus $50,000, and its undivided profits $29,907.65.

The evidence is undisputed that Ellery knew nothing about the transaction of December 18, 1930, which resulted in a reorganization of the bank with greatly reduced resources, until on or about January 27, 1932, when there was laid before him a report, as of December 31, 1931, of the bank's resources and liabilities with a description thereof made by examiners Roach, Bailey, and King, deputed by Ellery for that purpose. The examiners' report showed the bank's resources and liabilities to be $4,222,252.14. Of the assets $2,257,569.26 were loans; $1,027,045.94 were invested in United States, state, county, and municipal bonds, state and county warrants and other bonds and securities; $217,325.19 in banking house furniture, fixtures, city and county realty; and $614,916.31 in

cash and due from banks, etc. The total deposits were $3,847,117.64 and the total cash and due from banks was $614,916.31; the reserve 15.98 per cent.; estimated losses were placed at $74,382.25; and doubtful, loss probable $97,454.11. Indorsed on the report of the examiners were the following "criticisms":

"(1) Excess loans in continued violation of Section 223, Revised Statutes of Arizona, 1928.

"(2) Too many unsecured and large lines of credit.

"(3) Financial statements supporting continuing or new lines should be checked very closely—Valuations should be conservative.

"(4) Bonds pledged to secure Surplus substituted by others without the approval of this department.

"(5) Furniture & Fixtures account not depreciated regularly, but should be. A detailed inventory should be on file.

"(6) Section 221, Revised Statutes of Arizona, 1928, is not being complied with—Bank has acquired deposits in excess of ten (10) times the amount of its Capital stock and Surplus.

"(7) Surplus impaired $42,684.36.

"(8) Yearly examinations by Board of Directors are not made, as required by Section 240, Revised Statutes of Arizona, 1928.

"(9) $50,000.00 Bankers Blanket Bond is not considered adequate protection."

A copy of this report was served on the bank, and the superintendent, Ellery, wrote it instructions to charge off enough of the excess loans to bring them within the 15 per cent. limit. It appears that at the time the bank was closed all of the excess loans, except one, had been paid by the bank's taking from the loanees the security in payment of the debt.

Ellery was called by plaintiff for cross-examination and was questioned upon the disclosures in the examiners' report. He testified he concluded after examining the report that the bank was safe and sound and that it was expedient for it to continue in

business, and that he believed it to be safe and sound up to the time it closed; that it became unsafe and unsound because of the withdrawals of deposits the last few weeks prior to closing; that the heavy withdrawals were due to the depression and a general feeling of unrest; that the deposits were reduced by June 24, 1932 to $2,587,000, and that the last few days before closing there was an insidious run by depositors.

The court permitted one J. C. Darcey, a certified accountant who had also had experience in banking, over objection by defendant, to testify that the face of the report of the examiners showed that the bank's capital was impaired, and that it was unsafe and inexpedient for it to continue in business. This evidence was admitted on the avowal of the plaintiff that it in connection with other evidence would, or tend to, show that superintendent Ellery's conclusion that the bank was safe and sound and that it was expedient for it to continue in business, was arrived at in bad faith and not in the exercise of a sound discretion.

It was shown that Ellery had been tried and convicted for borrowing (very soon after he became superintendent of banks) $5,000 from the Arizona Bank, in violation of section 214, Revised Code of 1928.

It was the position of defendant below, and it is his contention here, that Ellery was guilty of no misconduct, nonfeasance, or bad faith, but that he honestly and in good faith examined into the condition and resources of the Arizona Bank, the mode of managing and conducting its affairs, the official actions of its board of directors, its investments and disposition of its funds, and whether it was violating any of the provisions of the law relating to banks,

as early after his appointment as reasonably possible, and had determined therefrom that the bank was safe and sound, and that it was expedient for it to continue business, and that even though his judgment was erroneous there was, under the facts and circumstances, no liability.

The position taken by plaintiff, broadly speaking, is, that the superintendent of banks is liable for any loss sustained by depositors, not only through his fault or negligence, but through the fault or negligence of his predecessor as well, and that such liability extends to the surety on his official bond.

The defendant insists that the evidence shows conclusively that Ellery acted in good faith in permitting the Arizona Bank to remain open and transact business, and that since his determination was *quasi* judicial, even though it were erroneous, the case should have been taken from the jury and decided by the court in his favor.

The plaintiff agrees that the superintendent's decision as to the safety and soundness of the bank, and the expediency of its continuing in business, is judicial in character and binding, except when given or made in bad faith, corruptly or through malice. The last statement seems to be the rule deducible from the cases and incorporated in our Banking Code, sections 209–272, Revised Code of 1928. The Banking Code, as said in *State ex rel. Robertson* v. *Farmers' State Bank,* 162 Tenn. 499, 39 S. W. (2d) 281, 282, of a similar act

"confers no power upon the superintendent of banks to regulate their internal management or to assume authority over the bank unless the facts appearing would authorize closing the institution. In conferring the limited, but discretionary, power upon the superintendent of banks of determining whether the condition of the bank or its internal management ren-

dered it unsafe or insolvent, it seems clear that the Legislature intended to clothe the superintendent with discretionary powers for the erroneous exercise of which he would not be liable to individuals unless he acted willfully and maliciously and transcended his legal authority. *Reed* v. *Conway*, 20 Mo. [22], 43; *Allen* v. *Commonwealth*, 83 Va. 94, 1 S. E. 607; *Kendall* v. *Stokes, 3* How. 87, 11 L. Ed. 506; *State* v. *American Surety Co.*, 26 Idaho [652], 674, 145 Pac. 1097, Ann. Cas. 1916E 209; *Sanders State Bank* v. *Hawkins,* (Tex. Civ. App.) 142 S. W. 84; *State* v. *Kern*, 51 N. J. L. 259, 17 Atl. 114; Throop, Public Officials, § 713.''

In *Deatsch* v. *Fairfield*, 27 Ariz. 387, 233 Pac. 887, 38 A. L. R. 651, the rule in this jurisdiction is stated in the first syllabus of the last citation as follows:

''A bank comptroller [superintendent] is not liable on his official bond for losses caused by his permitting a bank to continue business, if he honestly and in good faith examines its assets and arrives at the conclusion that it is not insolvent, although it later develops that he was mistaken in his judgment.''

Indeed this seems to be the rule generally as found in the decisions and text-books. *Yaselli* v. *Goff,* (C. C. A.) 12 Fed. (2d) 396, 56 A. L. R. 1239; *Morrill County* v. *Bliss*, 125 Neb. 97, 249 N. W. 98, 89 A. L. R. 932; *Fidelity & Casualty Co. of New York* v. *Brightman,* (C. C. A.) 53 Fed. (2d) 161; *Dunbar* v. *Fant*, 170 S. C. 414, 170 S. E. 460, 90 A. L. R. 1412; *State ex rel. Funk* v. *Turner,* 328 Mo. 604, 42 S. W. (2d) 594; Throop on Public Officers, page 258, § 345; 46 C. J. 1043; 22 R. C. L. 485.

The superintendent's decision, however, must be an honest one based upon an examination of the bank's resources and liabilities and the manner its officers conduct its business. If from the evidence it appears that the superintendent through bad faith or

from any corrupt motive has decided that the bank is safe and sound and that it is expedient for it to continue business, or if there is evidence tending to show that his decision was dishonest or in bad faith, the jury, under proper instruction, should be allowed to pass upon the question.

While from the evidence it appears Ellery performed his statutory duty of notifying the officers and directors of the "excess loans" and of other corrections in the conduct of its business to meet good banking practices and to conform with the law, because of favors he had received from the bank, it is entirely possible his judgment as to the bank's fitness and safety to continue business was not honest or in good faith. It was no doubt thought by the legislature that a superintendent of banks who borrowed from a bank under his official supervision would not be free to exercise his honest opinion as to its fitness to continue to do business and for that reason it made it a crime for "the superintendent or any examiner or employee of his office to borrow money, either directly or indirectly from a bank under the jurisdiction of the department." Section 214, Rev. Code 1928. So, we conclude that the question as to whether Ellery acted honestly and in good faith in permitting the bank to keep open under the circumstances was properly left to the jury.

As stated in the earlier part of this opinion, the complaint was originally drafted on the theory that defendant as surety and Ellery as principal were liable for losses to those depositors only who became such after Ellery had a reasonable time subsequent to his induction into the office of superintendent to examine the bank and familiarize himself with its soundness and business conduct. The complaint as amended included depositors who became such before

Ellery's administration and before he had had an opportunity to investigate the bank and determine its resources and manner of doing business. The evidence, as we understand it, shows both kinds of depositors and that the balances of the deposits made before defendant's responsibility attached constitute a large part of the loss. The complaint alleges that Ellery "permitted the said bank to remain open and to receive deposits from the plaintiff and the plaintiff's assignors as hereinafter set forth for over five months after he had knowledge, and well knew, that said Bank was in an unsafe and unsound condition to transact business and that it was unsafe and inexpedient for it to continue business."

This, we think, is a tacit admission that Ellery learned of the condition of the bank around five months before June 24th, the date it was finally closed, or on or about January 24th. So if the facts and circumstances were such as to establish by a preponderance of the evidence that Ellery learned on or about January 24th that the bank was unsafe and unsound, that its board of directors and officers were not conducting and managing its affairs in accordance with the laws, but contrary thereto, and was of the opinion it was unsafe and unsound, but did not close it for corrupt or willful reasons, the loss sustained by depositors after that date might well be urged to be the proximate result of Ellery's fault, and the depositors might be entitled to recover from him and his surety 100 per cent. of such loss less dividends. However, those depositors who became such before the date Ellery learned, or should have learned, of the bank's unsound condition and before he should have closed it, would be restricted to such damages as they were able to prove they suffered by reason of the bank's being wrongfully kept open after it should have been closed. In other words, if, after

the time Ellery should have closed the bank, the bank and its officers wasted, or so mismanaged its affairs as to reduce, its assets, to the extent of such waste or reduction such depositors would be damaged. But if the assets were not dissipated or lost, but were preserved, we cannot see how such depositors could have been damaged by Ellery's conduct. Such depositors might have a remedy against those persons who presided over and looked after the bank when deposits were made and before Ellery became superintendent of banks, provided their wrongful conduct was the cause of any loss to them, but as to Ellery and his official bond they have no remedy except perhaps for depreciation of assets, if any, after the bank should have been closed by him.

The instruction given to the jury upon plaintiff's request makes no distinction between the rule or measure of damages that should be applied to these two kinds of depositors. It reads:

"The Court instructs the jury that it is the undisputed evidence in the case that the loss of the plaintiff and his assignors through the failure of the Arizona Bank aggregated the sum of $20,917.52 after crediting the amounts of all deposits with all dividends received and with all dividends that may hereafter be paid. The limitation of the bond, however, is $20,000.00. If therefore you find for the plaintiff, your verdict will be in the sum of $20,000.00."

This instruction directs the jury to find for depositors the sum of their deposit, whether made before or after Ellery should have closed the bank, notwithstanding the whole thereof may have been deposited before. This cannot be the law. The error is fundamental and cannot be sidestepped or overlooked. When the court gives an instruction, it should clearly state the law applicable to the facts. If it misstates the law, and appears to be prejudicial,

it calls for a reversal. It is not like an omission to instruct. Neither can it be excused because the adversary also submitted an erroneous instruction on the same question.

 The evidence of the transaction of December 18, 1930, was admitted over defendant's objection that it occurred under another administration of the office of superintendent of banks, almost a year before Ellery's term began, and that neither the latter nor his surety could possibly be liable therefor. It was offered, as we understand it, to show that the bank's capital was impaired. It could not be competent for any other purpose, and we do not see that it was competent for that purpose. The official bond of Ellery was "in force and obligatory upon the principal and sureties therein for any and all breaches of the conditions thereof committed *during the time* such officer continues to discharge any of the duties of or hold the office." (Italics ours.) Section 74, Rev. Code 1928. This provision of the bond certainly exempts both Ellery and his surety for anything done by his predecessor, or the bank, or its officers, directors, or stockholders before or after his term. Another thing, what was done on December 18, 1930, at Flagstaff did not "impair" the Arizona Bank's capital, whatever it did to its resources. The Arizona Bank was the successor to the Arizona Central Bank and it had a right, by taking the proper steps, to reduce its capital stock, and we will presume the legal forms in that respect were complied with, else Ellery's predecessor would not have approved of what was done in the reorganization and licensed the Arizona Bank, as the law provides had to be done for it to do business. Section 220, Rev. Code 1928. This evidence would have been highly competent in an action against the participants in the transac-

tion of December 18th to recover from them the assets of the bank wrongfully appropriated by them, but it had no place in this action, and the effect of its admission could not have been otherwise than very prejudicial. This evidence should not have been admitted.

Of course any evidence, appearing in the bank's records or otherwise, showing that its capital stock of $250,000 was impaired, or its investments were unsafe or overvalued, was proper for what it was worth to refute Ellery's honesty and good faith in allowing the bank to continue business. For instance, it might be pointed out, as it was on the trial, that on the face of the examiners' report the losses appeared to be so large as to eat up the undivided profits, the surplus, and a large part of the capital.

It was improper to permit the witness Darcey to state that, as a result of his examination of the bank's resources and liabilities and the report of the examiners, he was of the opinion the bank was unsafe and unsound and that it was inexpedient for it to continue business. Whether Ellery's judgment on that question was correct or erroneous was not the issue; it was whether he had honestly and in good faith exercised his discretion to permit the bank to continue to operate. If so, his decision was conclusive, and it could make no difference what the opinion of others might have been under the same circumstances.

As stated in the forepart of this opinion, the bond, in terms, was to guarantee the fidelity of Ellery as *state bank examiner,* and while there was proof that it was intended to guarantee his fidelity as state superintendent of banks the complaint did not ask for its reformation nor did the judgment reform it. The bond should have been reformed to conform with

plaintiff's contentions, if the evidence justified it; and it was error to enter judgment against the surety on a bond guaranteeing Ellery's fidelity as *state bank examiner* for damages recovered against the surety on account of his actions as state superintendent of banks.

The defendant, when the court allowed a trial amendment of the complaint to include deposits before he became superintendent, asked for time to prepare to meet the new issues brought into the case by the amendment, and we think this request should have been granted. The amendment raised for the first time the question as to whether through Ellery's actionable fault the assets of the bank had been diminished after he took charge, and if so to what extent. It would seem the defendant should have had a right to investigate the evidence upon that question and been given time to do so.

The calling of Ellery by plaintiff for cross-examination was not error. He was liable for damages if his surety was. The fact is his liability is primary and that of his surety secondary, and except that the statute makes the obligation of the surety bond joint and several (§ 71, Rev. Code 1928), he would be an indispensable party. He was deeply interested in defeating the action because otherwise the surety could come back on him for any judgment it was required to pay. The defense of the surety was in his interest and for his benefit. It was not necessary under the statute providing for the cross-examination of a witness by an adversary that Ellery be a party to the action. Section 4416, Rev. Code 1928. It is enough that the witness be "a person for whose immediate benefit such action or proceeding is prosecuted or defended." The purpose of the statute is that a litigant may call his adversary in

interest, whether a party of record or not, without making him his own witness and elicit from him on cross-examination, if possible, material facts within his knowledge, precisely as if he had already been examined in his own behalf in chief. In 70 Corpus Juris 605, § 778, it is said:

"In order that a party may be thus called, he must be adverse to the party calling him, and be actively seeking a recovery against, or opposing a recovery by, such party, or a person for whose immediate benefit the action was brought or defended."

While there may be other reasons for extending this privilege of cross-examination of an adverse party, we think the principal one is adverse interest. In *Lally* v. *Cash*, 18 Ariz. 574, 164 Pac. 443, we placed the test of the right of cross-examination upon adverse interest and if that be a correct test, there can be no question but that it was proper to permit the plaintiff to cross-examine Ellery. An examination of his testimony shows that his antagonism to the plaintiff was genuine and very real.

We cannot give our consent to plaintiff's contention that liability arose on the surety bond because Ellery did not upon taking office institute suit to recover damages the Arizona Central Bank sustained by reason of the action of its officers and stockholders on December 18, 1930, in appropriating $575,000 of the assets of such bank. He had no right to maintain such action as long as the Arizona Bank was operating. The statute gives the superintendent of banks authority to bring and prosecute actions for the recovery of the assets of a bank only after it has been declared insolvent and turned over to him for liquidation. It is not shown that his failure to close the bank earlier caused plaintiff and his assignors any damage. In other words, it does not appear that

if such an action had been instituted by him, more would have been realized for the depositors than was realized in the suit brought by Thomas and compromised by his successor White with the approval of the superior court of Maricopa county and upon appeal by the Supreme Court of the state. *In re Arizona Bank's Estate,* 42 Ariz. 62, 22 Pac. (2d) 409.

■ The court gave several instructions to the jury, on the request of plaintiff, that are assigned as erroneous, and, while what we have said might be sufficient to guide the court on a retrial of the case, a word as to these instructions, we think, should be said. We quote one of such instructions:

"If you find from a preponderance of the evidence in this case that defendant Ellery had knowledge that this bank had violated any law of the State of Arizona or was conducting its business in an unsafe and unauthorized manner, or if the capital of this bank was impaired or if from an examination of the report provided for the defendant, Sid W. Ellery, had reason to conclude that this bank was in an unsafe and unsound condition to transact business, or that it was unsafe or inexpedient for it to continue business, and knowing said fact, said Sid W. Ellery permitted this bank to remain open, then the defendant Ellery was guilty of neglecting his official duty."

While this instruction does not, in so many words, say the superintendent of banks and his surety are liable for merely "neglecting his (Ellery's) official duty," that is the natural inference for the jury to draw from this instruction. Such liability arises only when the superintendent of banks has acted corruptly or through bad faith or malice. *Dunbar* v. *Fant, supra,* and other cases cited above. This is because such officer is charged by the banking code with judicial, and not ministerial, duties in taking over the assets of a bank. Neither the jury nor the court may substitute its judgment for the judgment

and discretion of the superintendent on that question, and as long as the evidence shows he has acted honestly and in good faith, however much he may have been mistaken, as to the bank's safety and soundness, his judgment is final. The instruction ignores the elements of corruption, bad faith, and malice. It is said in 46 Corpus Juris 1043, section 328:

"The general rule protecting judges from civil liability for acts within the limits of their jurisdiction applies to officers exercising *quasi*-judicial powers, whose discharge involves the exercise of judgment and discretion, exempting them from liability for error or mistake of judgment in the exercise thereof in the absence of corrupt or malicious motives, although it has been held in some cases that if the officer whose acts are complained of keeps within his powers, his motives, however corrupt and malicious they may be, may not be made a reason for holding him liable for the damages caused by his acts. The judicial character of the officer's act, rather than the judicial character of his office, furnishes the basis for the exemption, if he is exempt."

This text is abundantly supported by the cases cited thereunder. The instruction is basically wrong in telling the jury that it was neglect of official duty for the superintendent to fail to close the bank if he had knowledge that it "had violated any law of the state," because the law imposes no such duty upon the superintendent. If it did, then it would be his duty if he learned of a loan by the bank at an usurious rate of interest, even though the assets were abundant and 100 per cent. liquid, to close it. The failure by the superintendent to close a bank when he discovers its capital "is impaired or reduced below the amount required by law," is not classed by the statute as "neglecting his official duty." In such case the law provides that "he shall order such bank to make good the deficiency within sixty days after

the date of such order'' (section 242, Rev. Code 1928), and caring for the deficiency then becomes an internal affair of the bank solely in charge of its directors.

Finally, the instruction was erroneous in submitting to the jury whether the superintendent's conclusion was the proper or correct one under the circumstances. It, in effect, said if the jury concluded that he should have closed the bank, notwithstanding his discretion was honestly and conscientiously exercised, then Ellery was guilty of neglecting his official duty.

Some of the errors that we have noticed might be overlooked, but others are so fundamental that we find it necessary to reverse the case and order a new trial, to be had in accordance with this opinion.

LOCKWOOD, C. J., and McALISTER, J., concur.